**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED

SEP 20 2002

JUDGE MATTHEW F. KENNELLY
UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| JAMSPORTS AND ENTERTAINMENT, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 2298 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| PARADAMA PRODUCTIONS, INC. | ) | Magistrate Judge Denlow |
| d/b/a AMA PRO RACING, CLEAR | ) | |
| CHANNEL COMMUNICATIONS, INC., | ) | |
| SFX ENTERTAINMENT, INC. d/b/a | ) | |
| CLEAR CHANNEL ENTERTAINMENT, | ) | |
| SFX MOTOR SPORTS, INC., | ) | |
| d/b/a CLEAR CHANNEL | ) | |
| ENTERTAINMENT - MOTOR SPORTS | ) | |
| | ) | |
| Defendants. | ) | |

**DOCKETED**

SEP 23 2002

## NOTICE OF FILING

To: Steven F. Pflaum, Esq.           Kevin L. Shoemaker, Esq.
    McDermott, Will & Emery          Shoemaker, Winkler Howarth & Taylor
    227 West Monroe Street           471 East Broad Street, Suite 2001
    Chicago, IL 60606                Columbus, OH 43215

**PLEASE TAKE NOTICE** that on September 3, 2002, we filed with the Clerk of the United States
District Court for the Northern District, an **Amended Complaint,** a true and correct copy of which is attached
hereto and served upon you.

JAMSPORTS AND
ENTERTAINMENT, LLC

By: _____
    One of its attorneys

Bruce S. Sperling
Paul E. Slater
Greg Shinall
Sperling & Slater, P.C.
55 West Monroe St., Suite 3300
Chicago, IL 60603
312/641-3200

James D. Roberts
Margaret C. Egan
Piper Rudnick
203 N. LaSalle St., Suite 1800
Chicago, IL 60601
312/368-4000

U.S. DISTRICT COURT

02 SEP -3 PM 5:46

13

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JAMSPORTS AND )
ENTERTAINMENT, LLC, )
)
              *Plaintiff,* )
)
      *v.* )     Case No. 02 C 2298
)
PARADAMA PRODUCTIONS, INC. )     Judge Kennelly
d/b/a AMA PRO RACING, CLEAR )
CHANNEL COMMUNICATIONS, INC., )    Magistrate Judge Denlow
SFX ENTERTAINMENT, INC. d/b/a )
CLEAR CHANNEL ENTERTAINMENT, )   Jury Demanded
SFX MOTOR SPORTS, INC., )
d/b/a CLEAR CHANNEL )
ENTERTAINMENT - MOTOR SPORTS, )
)
           *Defendants.* )

FILED

SEP 2 0 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
SEP 2 3 2002

## AMENDED COMPLAINT

Plaintiff JamSports and Entertainment, LLC ("JamSports") states the following for its

amended complaint[1] against Defendant Paradama Productions, Inc. d/b/a AMA Pro Racing ("AMA

Pro Racing"), Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel

Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports

(collectively "Clear Channel"):

### I. SUMMARY OF ACTION

1.     This is an action brought by JamSports for damages resulting from (i) AMA Pro

Racing's breach of its promotion agreements with JamSports, (ii) Clear Channel's wrongful

interference with JamSports' contractual rights, and (iii) Clear Channel's anticompetitive efforts to

drive JamSports out of the relevant market for the promotion of championship-level, dirt-track

stadium motorcycle racing, also known as supercross.

---

[1]    JamSports has filed this amended complaint pursuant to the current scheduling order.
However, discovery is still in its early stages. Among other things, JamSports is awaiting further
document production from AMA Pro Racing, its parent entity, the American Motorcyclist
Association (the "AMA"), and from Clear Channel (which has objected and refused to produce
documents in response to JamSports' subpoena). JamSports anticipates that it may be necessary to
add additional parties and claims as discovery progresses.

2.      In early November 2001, AMA Pro Racing named JamSports the promoter of the AMA Supercross racing series for the 2003-2009 racing seasons. Contemporaneous therewith, AMA Pro Racing and JamSports entered into a written promotion agreement (the "First Agreement") reflecting the material terms of the parties' agreed-to relationship, plus an obligation to negotiate confidentially, exclusively, and in good faith toward a final promotion agreement. Thereafter, JamSports proceeded to perform in accordance with the First Agreement and the parties negotiated the terms of a second, more definitive, promotion agreement (the "Promotion Agreement"). By early February, 2002, the parties finalized the Promotion Agreement, and it was approved by AMA Pro Racing's board of directors. However, AMA Pro Racing ultimately refused to provide JamSports with a signed Promotion Agreement and subsequently reneged upon the Promotion Agreement.

3.      Clear Channel is equally culpable for these breaches – if not more so. Until AMA Pro Racing appointed JamSports as the promoter of its Supercross series, Clear Channel had promoted the series. From the moment JamSports was named the new promoter, Clear Channel set out to kill the deal between AMA Pro Racing and JamSports and to exclude JamSports from the supercross promotion market. Clear Channel, with knowledge of JamSports' contractual rights, engaged in numerous communications with representatives of AMA Pro Racing (and its not-for-profit parent corporation, the American Motorcyclists Association (the "AMA")) in order to induce a breach of the First Agreement and to prevent the Promotion Agreement from being implemented.

4.      Clear Channel's wrongful conduct extended beyond its direct interference with JamSports' contractual rights. Clear Channel also sought to exclude JamSports from the supercross market through various other, anticompetitive means. For example, Clear Channel caused key stadiums to refuse to deal with JamSports and, on information and belief, sought to induce the motorcycle manufacturers that sponsor supercross teams and others to do the same.

5.      Clear Channel succeeded in its tortious and anticompetitive efforts. In March 2002, AMA Pro Racing purported to give Clear Channel the very rights to promote the AMA Pro Racing

2

Supercross racing series that had been contractually promised to JamSports. In other words, Clear Channel has succeeded in maintaining its monopoly stranglehold on the promotion of supercross.

6.    As a result, JamSports has sustained economic injuries in excess of $20 million.

## II. JURISDICTION AND VENUE

7.    The Court originally obtained jurisdiction by virtue of defendant AMA Pro Racing's removal of this action from the Circuit Court of Cook County, Illinois, pursuant to 28 U.S.C. § 1441(a).

8.    This Amended Complaint contains claims under 15 U.S.C. §§ 1, 2, and 15 and, thus, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1337(a).

9.    AMA Pro Racing negotiated the agreements that are at issue in this case with JamSports at JamSports' offices in Chicago, Illinois, and has conducted further negotiations with JamSports in Illinois. In addition, SFX Motor Sports, Inc. (d/b/a Clear Channel Entertainment-Motor Sports) maintains one of its principal places of business in this judicial district and, for purposes of venue, all of the Clear Channel entities reside, transact business and are found in this judicial district. Accordingly, venue is proper here pursuant to 28 U.S.C. § 1391(b), and 15 U.S.C. § 22.

## III. THE PARTIES

10.    JamSports is a Delaware limited liability company, having its principal place of business in Chicago, Illinois. JamSports is engaged in the business of, among other things, producing and promoting sporting events.

11.    On information and belief, AMA Pro Racing is an Ohio corporation having its principal place of business in Pickerington, Ohio. AMA Pro Racing is or has been engaged in, among other things, the business of sanctioning, scheduling, producing and promoting motorcycle sporting events, and negotiating to do the foregoing, in Illinois and throughout the United States. According to its website, AMA Pro Racing is the leading sanctioning body for the professional

motorcycle sport in the United States. At all times relevant hereto, AMA Pro Racing was present and has transacted business in Illinois.

12.     Clear Channel Communications, Inc. is a Texas corporation and maintains its principal place of business at 200 East Basse Road, San Antonio, Texas 78209. Clear Channel and its subsidiaries hold themselves out as an integrated group of live entertainment and media businesses — all doing business under the "Clear Channel" banner. Including its integrated subsidiaries, Clear Channel is the nation's largest concert and concert tour promoter (it produces in excess of 65% of all major concert events and over 75% of all concert tours), it owns and/or controls numerous live entertainment venues, owns nearly 1,200 radio stations, numerous television stations and nearly 750,000 outdoor advertising displays. Through its motor sports subsidiary, Clear Channel dominates the promotion of stadium and arena motorcycle racing and other motor sports events (*e.g.*, monster truck events) in the U.S., including the supercross racing events that are at issue here. Clear Channel Communications transacts business and is found in this District.

13.     On information and belief, SFX Entertainment, Inc.: (i) is a Delaware corporation; (ii) does business as Clear Channel Entertainment; (iii) maintains its principal places of business at 220 West 42nd Street, New York, NY 10036, and 2000 West Loop South, Suite 1300, Houston, Texas 77027; (iv) is a subsidiary of Clear Channel Communications and is part of the integrated group of live entertainment and media businesses doing business under the "Clear Channel" banner; and (v) transacts business and is found in this District.

14.     On information and belief, SFX Motor Sports, Inc.: (i) is a Texas corporation; (ii) does business as Clear Channel Entertainment - Motor Sports; (iii) maintains its principal places of business at 495 N. Commons Drive, Suite 200, Aurora, Illinois 60504; (iv) is a subsidiary of Clear Channel Communications, Inc. and is part of the integrated group of live entertainment and media

4

businesses doing business under the "Clear Channel" banner; and (v) resides, transacts business and is found in this District.[2]

## IV. RELEVANT MARKETS AND SUBMARKETS

15.     There exists a relevant market in the United States for the promotion of championship-level, dirt-track stadium motorcycle racing, also known as supercross (the "market for the promotion of supercross" or the "supercross promotion market"). There also exists a relevant market in the United States for the sanctioning of supercross races. (The "market for the sanctioning of supercross races " or the "supercross sanctioning market"). In the relevant market for the promotion of supercross, there also exist relevant geographic submarkets in several metropolitan areas, including Phoenix, Arizona, Los Angeles, California, San Diego, California, San Francisco, California, Daytona, Florida, Miami, Florida, Indianapolis, Indiana, Detroit, Michigan, Minneapolis, Minnesota, St. Louis, Missouri, Las Vegas, Nevada, Dallas, Texas, Houston, Texas, and Salt Lake City, Utah. Hundreds of thousands of spectators attended supercross events in 2001.

16.     In the alternative, there exists a relevant market in the United States for the production and promotion of specialized motor sports events presented in stadiums and arenas, including supercross, arena cross, monster truck events, freestyle motocross events and drag racing. There also exist relevant geographic submarkets for the production and promotion of such specialized motor sports events in major metropolitan areas. Clear Channel, alone, stages over 650 such events annually.

---

[2]     Because these three Clear Channel entities hold themselves out to be an integrated business enterprise, and because, as alleged herein, SFX Motor Sports d/b/a Clear Channel Entertainment - Motor Sports has leveraged the market power of its parent and sister entities in the concert promotion and media markets to monopolize or attempt to monopolize the relevant supercross promotion market and submarkets, JamSports has named all three as defendants herein. However, JamSports does not base any of its claims on the theory that the Clear Channel entities conspired only with each other to violate the antitrust laws. Rather, the Clear Channel entities named herein constitute a single entity for purposes of the antitrust claims alleged herein.

5

## V. **TRADE AND COMMERCE**

17.　　The subject matter of this action and the conduct alleged herein involve interstate commerce. In addition, the parties to this action are all involved in interstate commerce. Among other things, supercross, the AMA Supercross series involve, and AMA Pro Racing, JamSport and Clear Channel are involved in, *inter alia*, (i) the interstate transportation, provision and receipt of goods and services, and (ii) commercial communications through the mails, over the wires and through the airwaves.

## VI. **ALLEGATIONS COMMON TO ALL COUNTS**

18.　　AMA Pro Racing represents and holds itself out as being the owner of, and sanctioning body for, the AMA Supercross Series,　　which is a championship-level, dirt-track motorcycle racing series held in large indoor and outdoor stadiums around the U.S. each year from January through May. The AMA Supercross Series is an extremely valuable franchise. The series generates approximately $40 million in annual revenues, including gate receipts, ancillary revenues, sponsorships and television rights.

19.　　From 1997 through 2002, the AMA Supercross Series was promoted by Clear Channel (or by companies that Clear Channel subsequently acquired). However, Clear Channel's contract to promote the AMA Supercross Series was to expire at the conclusion of the 2002 racing season.

20.　　Beginning in the Summer of 2001, AMA Pro Racing solicited bids from other promoters, including JamSports, for the purpose of entering into an agreement to promote the AMA Supercross Series in with the 2003 and beyond.

### **The First AMA Pro Racing Agreement With JamSports**

21.　　On November 2, 2001, AMA Pro Racing and JamSports entered into an agreement under which JamSports agreed to produce and promote the AMA Supercross Series, and undertake related sales and marketing matters (the "First Agreement"). A true and correct copy of the First Agreement is attached as Exhibit A.

6

22.    Pursuant to Paragraph 1 of the First Agreement, AMA Pro Racing and JamSports agreed to produce and promote not less than fourteen (14) AMA Supercross Series events per season (defined as January 1 through the first week of May) for a period of seven (7) years beginning January 1, 2003, with an opportunity to extend the term.

23.    AMA Pro Racing and JamSports also agreed that JamSports would have the exclusive rights to produce and promote the AMA Pro Racing Supercross Series in North America. Paragraph 2 of the First Agreement states:

> **Exclusive Production and Promotion Rights**. JamSports shall have the exclusive right to produce and promote the AMA Pro Racing Supercross events in North America, with the exception of two (2) events of which AMA Pro Racing reserves the right to directly promote or select a promoter (the "Exception Events"). Subject to the Exception Events (currently anticipated to include the Daytona Beach and California Speedway Supercross events), JamSports shall have the exclusive production and promotion rights for fourteen (14) of the sixteen (16) Supercross events currently included in the season plus any additional Supercross events added in the future. The parties agree that the Exception Events shall not include any Supercross events that would territorially compete with any of the Supercross events promoted by JamSports.

24.    In addition, the First Agreement sets forth the parties' understanding with respect to financial terms. Pursuant to Paragraph 7(a), AMA Pro Racing and JamSports agreed that AMA Pro Racing would receive the greater of eight percent (8%) of the gross gate receipts or thirty percent (30%) of the net income from each Supercross event. Paragraph 7(a) of the First Agreement states, in part:

> **Event Revenue Share** . AMA Pro Racing shall receive the greater of (i) eight percent (8%) of the gross gate receipts (less applicable taxes and facility fees) of each Supercross event, or (b) thirty percent (30%) of Net Income of each Supercross event (in either case, hereinafter referred to as "Revenue Share"), and the remainder of the gross gate receipts or Net Income, as the case may be, of each Supercross event, shall be retained by JamSports ....

25.    The First Agreement also contained terms concerning "Other Revenue Streams." In Paragraph 8, the parties agreed to terms concerning "Series Media and Marketing Rights," "Event Sponsorship," "Product Merchandising Revenue," and Internet Merchandising and Audio Visual

Products and Other Products." Those terms contemplate, *inter alia*, shared revenue between JamSports and AMA Pro Racing resulting from the business relationship.

26.     Pursuant to Paragraph 7(b), JamSports agreed to advance to AMA Pro Racing a non-refundable amount of three million dollars ($3,000,000.00). Paragraph 7(b) states:

> **Advance**.
>          (i)      **Timing, Purpose, Amount**. JamSports shall advance to AMA Pro Racing on a mutually agreed upon date (but not before the second calendar quarter of the calendar year 2002) the non-refundable amount of Three Million Dollars ($3,000,000.00) (the "Advance"), which amount shall be used by AMA Pro Racing as general working capital to ensure the success of the Supercross series through the creation of a media and television series that attracts sponsorships.
>          (ii)     **Recoupment by JamSports**. JamSports is entitled to and shall recoup the Advance from AMA Pro Racing's Revenue Share. After JamSports recoups the Advance, JamSports shall commence paying AMA Pro Racing's Revenue Share To AMA Pro Racing.

27.     The First Agreement between AMA Pro Racing and JamSports contained all of the material terms and conditions for the transaction that the parties had agreed to undertake.

28.     The parties anticipated and agreed that they would reduce the terms and conditions that had been agreed upon in their First Agreement into other written agreements which, collectively, would be referred to as the Promotion Agreement (the "Promotion Agreement").

29.     Having already negotiated and agreed to all of the material terms and conditions for the transaction that the parties had agreed to undertake, the parties agreed to use their best efforts and negotiate in good faith the final form of the Promotion Agreement, together with any remaining contractual terms and conditions that would be necessary to carry out the intent of the First Agreement. Paragraph 13 of the parties' First Agreement states:

> The parties shall use their best efforts, negotiating in good faith, to enter into the Promotion Agreement within thirty (30) days from the date this letter is fully executed by the parties hereto.

30.     Having already negotiated and agreed to all of the material terms and conditions for the transaction that the parties had agreed to undertake, the parties further agreed that they would negotiate -- exclusively with each other -- the final form of the Promotion Agreement, together with

8

any remaining customary contractual terms and conditions that would be appropriate for the transaction. Paragraph 13 of the First Agreement states:

> **Exclusivity.** Each of the parties agrees that for a period of ninety (90) days after the date this letter is fully executed by the parties hereto [], AMA Pro Racing and JamSports shall negotiate exclusively and in good faith with one another, and neither party shall enter into any discussions or negotiations with any third party with respect to the subject matter hereof.

31.     In furtherance of their agreement and commitment to negotiate in good faith and exclusively with each other, the parties also agreed to promptly notify each other if they received any other offers from other promoters seeking to promote and market AMA Supercross events. Paragraph 13 specifically provides:

> If a party hereto shall receive any offer from a third party with respect to the subject matter hereof, the receiving party shall promptly notify the other party hereto of the offer, the name of the offeror and the terms thereof.

32.     The parties also agreed to protect the confidentiality of the business relationship pending the anticipated execution of a formal Promotion Agreement. Paragraph 12 of the First Agreement states:

> **Confidentiality**. AMA Pro Racing and JamSports each agree that the terms of this letter agreement, and, in particular, its financial terms, are private and confidential. Neither party hereto shall divulge the terms of this letter of intent to any other persons in any manner, except each party may so inform its attorneys, accountants and financial consultants as reasonably necessary for the performance of its obligations hereunder and under the Promotion Agreement, who, however, shall be instructed not to divulge its terms to any other persons except and unless as they may be finally required by law or court process. In the event of a breach of the foregoing, the damaged party may seek recovery of all damages as allowed by law, including, without limitation, injunctive relief.

33.     Although the parties anticipated subsequently entering into the Promotion Agreement, the First Agreement explicitly provided that it, in and of itself, created a binding obligation on AMA Pro Racing to use its best efforts and negotiate the remaining terms of the deal in good faith, to deal exclusively with JamSports pending execution of a definitive promotion agreement, and to observe the confidentiality provisions contained in the First Agreement.

9

**JamSports' Performance Under the First Agreement**
**and in Reasonable Anticipation of the Promotion Agreement**

34.     On November 5, 2001, AMA Pro Racing's Chief Executive Officer, Scott Hollingsworth, sent a letter to numerous motor sports venues, announcing its partnership with JamSports and informing the venues that it had authorized JamSports to negotiate with the venues on an exclusive basis on AMA Pro Racing's behalf. A true and correct copy of AMA Pro Racing's November 5, 2001, letter is attached as Exhibit B.

35.     In a press release issued on November 6, 2001, AMA Pro Racing announced that it selected JamSports as its new promoter partner for the AMA Supercross Series. It further announced that it made the decision after evaluating proposals from several companies, including Clear Channel, the promoter whose current contract with AMA Pro Racing is scheduled to expire at the end of the 2002 season. A true and correct printed copy of AMA Pro Racing's webpage as of February 27, 2002, devoted to the announcement of a partnership with JamSports, is attached as Exhibit C.

36.     In reliance upon AMA Pro Racing's representations and its agreement to negotiate exclusively and in good faith with JamSports, and with AMA Pro Racing's full knowledge and acquiescence, JamSports immediately took steps to promote the AMA Supercross Series and to prepare for the 2003 season. As a result of JamSports' pre-existing relationship with Indianapolis Motor Speedway ("IMS"), it arranged a meeting between IMS and AMA Pro Racing, the result of which was an agreement to develop long-term plans for television coverage of AMA Supercross events. On December 3, 2001, AMA Pro Racing and JamSports issued a joint statement announcing AMA's alliance with IMS. A true and correct copy of AMA Pro Racing's webpage as of February 27, 2002, devoted to the IMS announcement, is attached as Exhibit D.

37.     AMA Pro Racing issued another joint statement on December 7, 2001, announcing a television partnership with Speedvision, a 24-hour cable network devoted to motor sports. A true and correct copy of AMA Pro Racing's webpage as of February 27, 2002, devoted to the Speedvision announcement is attached as Exhibit E.

10

38.     In reliance upon AMA Pro Racing's representations and its agreement to negotiate exclusively and in good faith, JamSports incurred substantial expenses negotiating with marketing, radio, merchandising, and sponsorship entities in an effort to promote the AMA Supercross Series and to prepare for the 2003 season.

39.     On December 27, 2001, AMA Pro Racing and JamSports issued a joint statement announcing the list of major market cities for the 2003 racing season. A true and correct printed copy of AMA Pro Racing's webpage (as it existed on February 27, 2002), devoted to the racing schedule announcement, is attached as Exhibit F.

40.     In reliance upon AMA Pro Racing's representations and its agreement to negotiate exclusively and in good faith with JamSports, and with AMA Pro Racing's full knowledge and acquiescence, JamSports also committed extensive resources to ensure that its infrastructure would be sufficient to support its partnership with AMA Pro Racing. For instance, in January, 2002, JamSports committed office space to AMA Pro Racing staff and AMA Pro Racing staff actually moved into JamSports' offices.

41.     In reliance upon AMA Pro Racing's representations and its agreement to use its best efforts and negotiate exclusively and in good faith with JamSports, and with AMA Pro Racing's full knowledge and acquiescence, in November, 2001, JamSports entered into a contract with Scoop Marketing, a public relations firm, for the sole purpose of promoting its relationship with AMA Pro Racing.

**The AMA Supercross Series Promotion Agreement**

42.     Two days prior to the expiration of the exclusivity period, on or about January 30, 2002, AMA Pro Racing contacted JamSports and demanded certain modifications to the Promotion Agreement. It also informed JamSports that it would accept the form and content of the Promotion Agreement once those final modifications had been included in the Promotion Agreement.

43.     Thereafter JamSports prepared a revised draft of the parties' Promotion Agreement, incorporating all of AMA Pro Racing's requested modifications, for consideration by the parties.

11

The revised draft of the Promotion Agreement was forwarded to AMA Pro Racing on February 1, 2002.

44.     Because AMA Pro Racing waited until the end of the exclusive negotiating period to demand these modifications, the parties by separate agreement dated February 1, 2002, extended the period to February 5, 2002. A true and correct copy of the February 1, 2002, letter is attached as Exhibit G. Even during the extension period, AMA Pro Racing delayed responding to JamSports and thus delayed concluding the transaction to which the parties had agreed, in breach of the terms of the First Agreement.

45.     On February 5, 2002, JamSports sent a letter to AMA Pro Racing confirming its acceptance of AMA Pro Racing's additional terms and notifying AMA Pro Racing that JamSports was ready, willing, and able to sign the Promotion Agreement. A true and correct copy of the February 5, 2002, letter is attached as Exhibit H.

46.     On February 8, 2002, JamSports sent a letter to AMA Pro Racing, again confirming its acceptance of all terms in the Promotion Agreement. True and correct copies of JamSports' January 8, 2002, acceptance letter and the Promotion Agreement are attached as Exhibits I and J respectively.

47.     Following JamSports' acceptance of AMA Pro Racing's modifications, there were no outstanding issues between the parties with respect to the Promotion Agreement.

48.     On or about February 14, 2002, AMA Pro Racing's Board of Directors approved the Promotion Agreement with JamSports.

49.     However, despite approval by its Board of Directors, AMA Pro Racing subsequently refused to provide JamSports with a signed Promotion Agreement, instead reneging on such agreement.

### Clear Channel's Interference With the
### First Agreement and the Promotion Agreement

50.     On November 5, 2001, AMA Pro Racing advised Clear Channel in writing that it had entered a contract with JamSports for the promotion of AMA Supercross commencing with the 2003

12

season, *i.e.*, the First Agreement. AMA Pro Racing also informed Clear Channel that it was obligated to deal and negotiate only with JamSports with respect to the promotion of the 2003 AMA Supercross and beyond. Moreover, on November 6, 2001, AMA Pro Racing issued a press release announcing that it had accepted JamSports' proposal to be the AMA Supercross promoter commencing in 2003-2009 seasons.

51.     Despite its knowledge of the First Agreement and its exclusivity provisions, Clear Channel contacted representatives of AMA Pro Racing and the AMA (AMA Pro Racing's not-for-profit parent company) on numerous occasions, in person, by telephone, and in writing for the purpose of obtaining the rights to promote the AMA Supercross for the 2003 season.

52.     Among other improper contacts, Clear Channel made written and oral proposals to AMA Pro Racing regarding the 2003 season, and it negotiated with, lobbied and pressured the directors of both AMA Pro Racing and the AMA in an effort to obtain the promotion rights that had been contractually promised to JamSports, and with respect to which AMA Pro Racing had a duty to deal and negotiate only with JamSports.

53.     During the exclusive negotiating period and in violation of its duty to negotiate with JamSports in good faith, AMA Pro Racing was engaged in discussions and/or negotiations with Clear Channel with respect to the subject matter of the First Agreement and Promotion Agreement. On information and belief, AMA Pro Racing also communicated the confidential terms of the First Agreement and the Promotion Agreement to Clear Channel and others.

54.     Indeed, P.J. Harvey, a member of AMA Pro Racing's Board of Directors, was negotiating with Clear Channel at the same time that AMA Pro Racing's CEO, Scott Hollingsworth, was negotiating with JamSports.

55.     As a result of Clear Channel's illicit negotiations with AMA Pro Racing, AMA Pro Racing refused to provide JamSports with a signed Promotion Agreement and, subsequently, renounced its agreements with JamSports. AMA Pro Racing subsequently announced that it had granted Clear Channel the AMA Supercross series promotion rights for the 2003-2009 seasons.

13

## Clear Channel's Anticompetitive Conduct in the Supercross Market

56.     In addition to trampling JamSports' contractual rights, Clear Channel also embarked on a plan to exclude JamSports from the supercross promotion market in the event that its efforts to induce AMA Pro Racing to abandon its contracts with JamSports proved unsuccessful.

57.     Supercross races are presented in stadiums and for years the AMA Supercross has been presented in stadiums in metropolitan areas where there is an established fanbase. Indeed, the ability to present supercross races in major stadiums around the country has been integral to the sport's past success. Clear Channel knew this and knew that any competitor entering the supercross promotion market would seek to present the AMA Supercross 2003 series in these key stadiums. In an effort to maintain its monopoly position in the relevant market and geographic submarkets, Clear Channel set out to prevent anyone else from obtaining access to key stadiums for the purpose of presenting supercross events. It did so by using its dominant market power in the concert, motor sports and media markets to coerce stadiums to refuse to deal with JamSports or others.

58.     By its own account, Clear Channel is one of the world's leading promoters, producers, and marketers of live entertainment. According to the December 21, 2001 issue of *Billboard Bulletin* (a music industry daily), "*CCE [Clear Channel Entertainment]-promoted shows accounted for 66.4% of the U.S. concert industry and 63.5% of all numbers reported worldwide.*" In its January 2002 review of the concert industry in 2001, *Pollstar* (another music industry publication) noted that "*Among promoters, it's no shock that 161 of the Top 200 tours were promoted by Clear Channel Entertainment. Last year, under the name SFX, the concert behemoth [Clear Channel] did 150 of the Top 200.*" Clear Channel also has a media empire consisting of approximately 1,200 radio stations, 20 television stations (either owned or substantially managed by Clear Channel), and 750,000 billboards and other outdoor displays. (The promotion of concerts and concert tours in the United States, generally, and in distinct metropolitan areas, specifically, are relevant product and geographic markets and/or submarkets. The ownership of and control over media outlets, radio

14

stations, televisions and outdoor displays in the United States, generally, and in distinct metropolitan areas, specifically, are also relevant product and geographic markets and/or submarkets.)

59.     The same stadiums that have traditionally hosted supercross events also host large concerts and concert tours throughout the year, and they rely on local media outlets to promote and sell tickets to the events which they host. As the nation's dominant concert promoter and radio station owner, Clear Channel can affect the financial fate of these stadiums. As the dominant promoter of specialty motor sports events, Clear Channel had additional leverage over these stadiums. Just as it has done on other occasions, Clear Channel knew that it could bring pressure to bear on the stadium owners to achieve its anticompetitive goals in the supercross market as well.

60.     In particular, by leveraging its dominant market power in the concert, motor sports and media markets, Clear Channel induced stadium owners to refuse to deal with JamSports. Among other things, Clear Channel entered into and/or invoked exclusive dealing agreements or understandings (both formal written agreements and informal arrangements) with such stadiums that precluded the stadiums from providing space to JamSports or any other "motorcycle" or "motor sports" events during the January - May supercross season.

61.     Clear Channel's heavy-handed, anticompetitive tactics had their intended result. JamSports' requests for dates during the 2003 AMA Supercross season were rejected (or indefinitely forestalled) by Edison Field (Anaheim), Texas Stadium (Dallas), the Silverdome (Detroit), Ford Field (Detroit), Reliant Stadium (Houston), Sam Boyd Stadium (Las Vegas), Pro Player Stadium (Miami), the Metrodome (Minneapolis), Bank One Ballpark (Phoenix), Rice-Eccles Stadium (Salt Lake City), Qualcomm Stadium (San Diego), and America's Center (St. Louis). These stadiums refused to deal with JamSports as a result of Clear Channel's anticompetitive efforts, and many of them expressly cited Clear Channel as the reason for excluding JamSports.

62.     While JamSports ultimately was able to assemble an AMA Supercross schedule by entering contracts with other venues and in other cities, Clear Channel was successful in excluding JamSports from several geographic markets.

15

63.     Clear Channel also leveraged its dominance in the concert, specialty motor sports, and media markets – and its exclusive dealing arrangements with key stadiums – in an effort to induce the motorcycle manufacturers that sponsor supercross teams, other motorcycle business, and directors of AMA Pro Racing and the AMA, to thwart JamSports entry into the supercross promotion market.

64.     In particular, several of the motorcycle manufacturers that sponsor supercross racing teams, *e.g.*, Honda, Kawasaki, and Suzuki, and other motorcycle-related businesses have representatives who sit on the board of directors of the AMA (AMA Pro Racing's not-for-profit parent). The Honda representative also sits on the board of AMA Pro Racing. On information and belief, Clear Channel leveraged its dominance in these other markets to induce these motorcycle manufacturers, motorcycle businesses and directors to go along with Clear Channel's plan to drive JamSports out of the supercross market and to obtain for itself the AMA Supercross promotion rights that had been contractually promised to JamSports.

65.     Clear Channel's improper and anticompetitive efforts with respect to the motorcycle manufacturers, other motorcycle businesses, stadiums and the directors of AMA Pro Racing and the AMA, ultimately proved to be the undoing of JamSports' relationship with AMA Pro Racing. Specifically, even though JamSports had finalized the Promotion Agreement with AMA Pro Racing and even though the board of directors of AMA Pro Racing approved the Promotion Agreement (over the Honda representative's objection), the board of directors for the AMA renounced the JamSports contracts and directed AMA Pro Racing not to sign the Promotion Agreement.    The AMA board did so despite the fact that neither of JamSports' agreements with AMA Pro Racing were even subject to AMA approval. Thus, as a direct result of Clear Channel's interference and anticompetitive conduct, the AMA directors (including the representatives of the motorcycle manufacturers) ousted JamSports as the AMA Supercross promoter in direct contravention of the First Agreement and the Promotion Agreement.

16

**Clear Channel's and AMA Pro Racing's
Anticompetitive Market Allocation Agreement**

66.     At the same time it was violating its agreements with JamSports, AMA Pro Racing was also negotiating an anticompetitive pact with Clear Channel. Specifically, AMA Pro Racing and Clear Channel entered into an agreement allocating the (i) U.S. market for supercross sanctioning to AMA Pro Racing and (ii) the U.S. market for supercross promotion to Clear Channel. Prior to entering this anticompetitive agreement, Clear Channel and AMA Pro Racing competed with each other in these markets: they each (either on their or own or with other partners) were to sanction and promote competing supercross series commencing with the 2003 supercross season.

67.     Specifically, in late 2001, in response to AMA Pro Racing's appointment of JamSports as the AMA Supercross promoter, Clear Channel announced that it would promote a supercross series in competition with AMA Pro Racing/JamSports. With respect to this competing series, Clear Channel stated that it would partner with a sanctioning body other than AMA Pro Racing to enter the U.S. market or would act as its own sanctioning body in the U.S. Clear Channel also quickly announced a schedule of races for the competing series. Not surprisingly, the Clear Channel series of races was to take place in the very stadiums from which Clear Channel was actively working to bar JamSports.

68.     Thereafter, Clear Channel indicated its intent to drop its plans to present a competing supercross series and to cease efforts to partner with another sanctioning body to enter the U.S. market (or to enter the market as its own sanctioning body) if AMA would sever its ties with JamSports and give Clear Channel the right to promote the AMA Supercross series for the 2003 season and beyond. Ultimately, the AMA directors (including the motorcycle manufacturers) succumbed to this competitive threat and determined that AMA Pro Racing would not compete with Clear Channel in the market for supercross promotion. (JamSports did not and does not object to Clear Channel's competing with JamSports in the supercross promotion and presentation market. Rather, it did object and does object to Clear Channel's anticompetitive conduct in such market.)

17

69.     Thereafter, Clear Channel and AMA Pro Racing entered an agreement not to compete with each other in the respective markets for supercross sanctioning and supercross promotion. On April 12, 2002, Clear Channel and AMA Pro Racing announced that after months of negotiations, they had entered into a seven year agreement for the 2003-2009 AMA Supercross seasons. According to their press release, the Clear Channel/AMA Pro Racing agreement provides that AMA Pro Racing will sanction all supercross motorcycle races in the U.S. and that Clear Channel will produce and promote such races in the United States. (The April 12, 2002 press release is attached as Exhibit K.)

70.     Because of this anticompetitive treaty between Clear Channel and AMA Pro Racing, JamSports has been excluded from the supercross promotion market, and Clear Channel has maintained its monopoly position. As a result, competition has been stifled, consumers will suffer, and JamSports will lose millions of dollars of profits, in addition to the amounts it spent entering the market.

## VII.  CLAIMS FOR RELIEF

### Count I

### Breach of Contract –First Agreement

71.     JamSports repeats, realleges and incorporates by reference Paragraphs 1 through 70 as this Paragraph 71.

72.     The First Agreement reflected the material terms of the agreed-to relationship with respect to JamSports' promotion of the AMA Supercross series from 2003 through 2009. The First Agreement is itself a binding agreement giving JamSports the right to promote the AMA Supercross series from 2003 through 2009.

73.     Pursuant to the First Agreement, AMA Pro Racing also had an obligation to use its best efforts and negotiate in good faith the terms of the Promotion Agreement a second, more definitive agreement, i.e., the Promotion Agreement.

18

74.     The purpose of the negotiations, as explicitly stated in the First Agreement, was to enter into a final Promotion Agreement which, in addition to the terms set forth in the First Agreement, would contain "customary covenants, representations, warranties, conditions precedent and indemnification provisions to be agreed upon by the parties for a transaction of this size and nature." (First Agreement, Paragraph 11).

75.     Having encouraged and directed JamSports to expend resources in negotiating the Promotion Agreement and preparing for its performance, AMA Pro Racing was also required to complete the transaction in good faith.

76.     After notifying JamSports that the deal was complete pending inclusion of its final modifications to the Promotion Agreement and receiving JamSports' acceptance of those terms, AMA Pro Racing was obligated to continue in good faith and sign the Promotion Agreement.

77.     Even after notifying JamSports that it had obtained the approval of its Board of Directors, AMA Pro Racing refused to sign the Promotion Agreement and, subsequently, refused to perform in accordance with the terms of the Promotion Agreement.

78.     AMA Pro Racing's failure to sign the final Promotion Agreement following the conclusion of negotiations with JamSports and approval by AMA Pro Racing's board demonstrates its bad faith and failure to use its best efforts and to negotiate the Promotion Agreement in breach of the explicit terms of the First Agreement.

79.     AMA Pro Racing also breached the First Agreement by failing to deliver to JamSports – and by granting to Clear Channel – the promotion rights that had been contractually promised to JamSports with respect to the AMA Supercross series for the 2003 through 2009 seasons.

80.     AMA Pro Racing also materially breached the terms of the First Agreement by:

        (a)     failing and refusing to negotiate the terms of the Promotion Agreement in good faith;
        (b)     soliciting, encouraging, entertaining, and/or entering discussions and/or negotiations concerning a promotion agreement with Clear Channel prior to expiration of the exclusive negotiating period under the First Agreement;

19

        (c)     failing to promptly notify JamSports of any offers from third parties, including, but not limited to, Clear Channel, as well as the names of the offerors and the terms of the offers; and

        (d)     communicating the confidential terms of the First Agreement to third parties, including, but not limited to, Clear Channel.

81.     JamSports performed or was prepared to perform all of its obligations under the First Agreement.

82.     JamSports has been injured by AMA Pro Racing's numerous breaches of the First Agreement. Among other things, JamSports has been injured by AMA Pro Racing's breach of its obligation to use its best efforts and negotiate in good faith, including, but not limited to, its unreasonable refusal to sign the completed Promotion Agreement.

83.     JamSports has also suffered damages that were foreseeable to AMA Pro Racing at the time the parties entered into the First Agreement. The parties agreed that JamSports would produce and promote the AMA Supercross Series events for at least seven (7) years, and JamSports' damages include the loss of the business opportunities presented by that Agreement.

84.     JamSports also incurred consequential damages, including the loss of the additional business opportunities that were contemplated by the parties, including AMA Pro Racing, at the time that they entered into the First Agreement.

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendant Paradama Productions, Inc. d/b/a AMA Pro Racing, in the amount to be proven at trial, but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, together with its costs, and for such other and further relief as this Court deems just and appropriate. In the alternative, JamSports respectfully requests that this Court enter an order requiring AMA Pro Racing to (i) specifically perform the First Agreement, (ii) deliver a signed Promotion Agreement to JamSports, and (iii) specifically perform the Promotion Agreement, and awarding JamSports consequential damages as a result of AMA Pro Racing's failure to perform to date, and such other and further relief as this Court deems just and appropriate.

## Count II

### Breach of Contract - Promotion Agreement

85.     JamSports repeats, realleges and incorporates by reference Paragraphs 1 through 84 as this Paragraph 85.

86.     As of February 8, 2002, at the latest, the parties had entered into a binding Promotion Agreement. AMA Pro Racing's final modifications were accepted by JamSports and JamSports communicated its acceptance on February 8, 2002. Moreover, the board of directors of AMA Pro Racing voted to approve the Promotion Agreement.

87.     Pursuant to the First Agreement, AMA Pro Racing also had an obligation to negotiate any open issues with respect to the Promotion Agreement in good faith. In any event, given that there were no unresolved issues between the parties, AMA Pro Racing had a good faith obligation to enter into the Promotion Agreement. By virtue of the First Agreement, AMA Pro Racing was so obligated regardless of whether its board of directors – or the board of directors of its parent entity, the AMA – approved the Promotion Agreement.

88.     JamSports performed or was prepared to perform all of its obligations under the Promotion Agreement.

89.     AMA Pro Racing ultimately refused to provide JamSports with a signed Promotion Agreement and AMA Pro Racing has refused and failed to perform pursuant to the Promotion Agreement. Among other things, AMA Pro Racing failed to deliver to JamSports – and instead granted to Clear Channel – the promotion rights that were contractually promised to JamSports with respect to the AMA Supercross series for the 2003 through 2009 seasons.

90.     JamSports has been injured by AMA Pro Racing's breach of the Promotion Agreement and its breach of its obligation to use its best efforts and to negotiate in good faith under the Promotion Agreement. The parties agreed that JamSports would produce and promote the AMA Supercross Series events for at least seven (7) years and JamSports' consequential damages include the loss of the business opportunities presented by the Promotion Agreement.

21

91.     JamSports has also suffered consequential damages that were foreseeable to AMA Pro Racing at the time the parties entered into the Promotion Agreement. JamSports' consequential damages include the loss of the additional business opportunities that were contemplated by the parties, including AMA Pro Racing, at the time that they entered into the Agreement.

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendant Paradama Productions, Inc. d/b/a AMA Pro Racing, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, together with its costs, and for such other and further relief as this Court deems just and appropriate. In the alternative, JamSports respectfully requests that this Court enter an order requiring AMA Pro Racing to specifically perform the Promotion Agreement, and awarding JamSports consequential damages as a result of AMA Pro Racing's failure to perform to date, and such other and further relief as this Court deems just and appropriate.

### Count III

#### Tortious Interference With First Agreement
#### (Against Clear Channel)

92.     JamSports repeats, realleges and incorporates by reference Paragraphs 1 through 91 as this Paragraph 92.

93.     The First Agreement was a binding agreement that, *inter alia*, granted JamSports the right to promote the AMA Supercross series for the 2003-2009 seasons.

94.     Clear Channel had knowledge of the First Agreement, including its requirements of exclusivity, confidentiality and good faith.

95.     Despite such knowledge, Clear Channel communicated and negotiated with AMA Pro Racing, the AMA, and their representatives in an effort to obtain the promotion rights that had been contractually promised to JamSports with respect to the AMA Supercross series for the 2003-2009 seasons.

22

96.     Clear Channel engaged in such communications and negotiations with the improper purpose and effect of inducing AMA Pro Racing to breach its contractual obligations to JamSports, including the obligations of exclusivity, confidentiality and the obligation to negotiate in good faith the terms of the Promotion Agreement.

97.     As a result of Clear Channel's wrongful conduct, AMA Pro Racing breached the First Agreement, and JamSports has been injured thereby.

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, together with its costs, and for such other and further relief as this Court deems just and appropriate.

### Count IV

#### Tortious Interference With Promotion Agreement
#### (Against Clear Channel)

98.     JamSports repeats, realleges and incorporates by reference Paragraphs 1 through 97 as this Paragraph 98.

99.     The Promotion Agreement was a binding agreement that, *inter alia*, granted JamSports the right to promote the AMA Supercross series for the 2003-2009 seasons.

100.    Clear Channel had knowledge of the Promotion Agreement and the requirements of the First Agreement obligating AMA Pro Racing to negotiate exclusively, confidentially and in good faith with JamSports the terms of the Promotion Agreement.

101.    Clear Channel also knew that AMA Pro Racing had finalized the terms of the Promotion Agreement and that the board of directors of AMA Pro Racing had voted to approve the Promotion Agreement.

23

102.     Despite such knowledge, Clear Channel communicated and negotiated with AMA Pro Racing, the AMA, and their representatives in an effort to obtain the promotion rights that had been contractually promised to JamSports with respect to the AMA Supercross series for the 2003-2009 seasons.

103.     Clear Channel engaged in such communications and negotiations with the improper purpose and effect of inducing AMA Pro Racing to breach its contractual obligations to JamSports.

104.     As a result of Clear Channel's wrongful conduct, AMA Pro Racing breached the Promotion Agreement, and JamSports has been injured thereby.

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, together with its costs, and for such other and further relief as this Court deems just and appropriate.

### Count V

#### Violation of Section 2 of the Sherman Act - Monopolization
#### - Monopoly Leveraging (Against Clear Channel)

105.     JamSports repeats, realleges and incorporates by reference Paragraphs 1 through 70 as this Paragraph 105.

106.     Supercross races are presented in stadiums and, for years, the AMA Supercross series has been presented in stadiums in metropolitan areas where there was an established fanbase. Indeed, the ability to present supercross races in certain stadiums around the country has been integral to the sport's past success. Clear Channel knew this and knew that any competitor entering the supercross promotion market would seek to present supercross races in these key stadiums.

107.     Beginning in late 2001, Clear Channel set out to prevent anyone else from obtaining access to key stadiums for the purpose of presenting supercross events in 2003 and beyond. It did

24

so by using its dominant market power in the concert, motor sports, and/or media markets to coerce stadiums to refuse to deal with JamSports or others.

108. The same stadiums that have traditionally hosted supercross events also host large concerts and concert tours throughout the year, and they rely on local media outlets to promote and sell tickets to the events which they host. As the nation's dominant concert promoter and radio station owner, Clear Channel can affect the financial fate of these stadiums. As the dominant promoter of specialty motor sports events, Clear Channel had additional leverage over these stadiums. Just as it has done on other occasions, Clear Channel knew that it could bring pressure to bear on the stadium owners to achieve its anticompetitive goals in the supercross market as well.

109. In particular, by leveraging its dominant market power in the concert, specialty motor sports and media markets, Clear Channel induced stadium owners to refuse to deal with JamSports. Among other things, Clear Channel entered into and/or invoked exclusive dealing agreements or understandings (both formal written agreements and informal arrangements) with such stadiums that precluded the stadiums from providing space to JamSports or any other "motorcycle" or "motor sports" events during the January - May supercross season.

110. As result of Clear Channel's anticompetitive efforts, JamSports' requests for dates during the 2003 AMA Supercross season were rejected (or indefinitely forestalled) by the following stadiums: Edison Field (Anaheim), Texas Stadium (Dallas), the Silverdome (Detroit), Ford Field (Detroit), Reliant Stadium (Houston), Sam Boyd Stadium (Las Vegas), Pro Player Stadium (Miami), the Metrodome (Minneapolis), Bank One Ballpark (Phoenix), Rice-Eccles Stadium (Salt Lake City), Qualcomm Stadium (San Diego), and America's Center (St. Louis) – many of which expressly cited Clear Channel as the reason for excluding JamSports.      Thus, Clear Channel was successful in excluding JamSports from stadiums in several major markets.

111. The promotion of concerts and concert tours in the United States, generally, and in distinct metropolitan areas, specifically, are relevant product and geographic markets and/or submarkets. The ownership of and control over media outlets, radio stations, television stations and

25

outdoor displays in the United States, generally, and in distinct metropolitan areas, specifically, are also relevant product and geographic markets and/or submarkets. As alleged in the alternative, above, there also exists a relevant market or in the United States for the production and promotion of specialized motor sports events presented in stadium and arenas, including supercross, arena cross, monster truck events, freestyle motocross events and drag racing. There also exist relevant geographic submarkets for the production and promotion of such specialized motor sports events in major metropolitan areas. Clear Channel has market power in each of these relevant markets and submarkets.

112. Clear Channel also has market power in the relevant market and geographic submarkets for the promotion of supercross. Specifically, Clear Channel has controlled (and continues to control) over 90% of the relevant market for the promotion of supercross races in the United States, and 100% of the majority of relevant geographic submarkets for the promotion of supercross.

113. Clear Channel leveraged its power in the markets for concerts, specialty motor sports, and media (or, in the alternative, any one of the markets or submarkets) in order to maintain its monopoly in the relevant geographic submarkets for the promotion of supercross.

114. This conduct constitutes monopolization of the relevant geographic submarkets for supercross promotion in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

115. As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages,

26

trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

<u>Count VI</u>

<b>Violation of Section 2 of the Sherman Act - Attempt to Monopolize<br>- Monopoly Leveraging (Against Clear Channel)</b>

116.     JamSports repeats, realleges and incorporates by reference Paragraphs 105-115 as this Paragraph 116.

117.     Clear Channel engaged in the foregoing anticompetitive conduct with the specific intent of monopolizing the relevant market for the promotion of supercross on a national basis and/or on a geographic-submarket-by-geographic-submarket basis.

118.     This conduct constitutes an attempt to monopolize the relevant market for supercross promotion on a national basis and/or on a geographic submarket-by-geographic submarket basis in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

119.     As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE,** Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

### Count VII

### Violation of Section 2 of the Sherman Act - Conspiracy to Monopolize - Monopoly Leveraging (Against Clear Channel)

120.    JamSports repeats, realleges and incorporates by reference Paragraphs 105-115 as this Paragraph 120.

121.    Clear Channel conspired with and/or entered into anticompetitive agreements or understandings with the aforementioned stadiums for the purpose of monopolizing the relevant geographic submarkets for the promotion of supercross.

122.    These conspiracies and/or agreements constitute a conspiracies monopolize the relevant geographic submarkets for the promotion of supercross in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

123.    As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

### Count VIII

### Violation of Section 1 of the Sherman Act - Exclusive Dealing (Against Clear Channel)

124.    JamSports repeats, realleges and incorporates by reference Paragraphs 105-115 as this Paragraph 124.

28

125.     Clear Channel entered into exclusive dealing contracts, combinations or conspiracies with the aforementioned stadiums for the purpose and with the effect of unreasonably restraining competition in the relevant geographic submarkets for the promotion of supercross.

126.     These anticompetitive contracts, combinations, and/or conspiracies violate Section 1 of the Sherman Act (15 U.S.C. § 1).

127.     As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

### Count IX

#### Violation of Section 1 of the Sherman Act - Market Allocation
#### (Against Clear Channel and AMA Pro Racing)

128.     JamSports repeats, realleges and incorporates by reference Paragraphs 1-104 as this Paragraph 128.

129.     As of January 2002, Clear Channel and AMA Pro Racing competed with each other in the relevant markets for supercross sanctioning, on the one hand, and supercross promotion, on the other.  Indeed, they each (either on their own or with other partners) were to sanction and promote competing supercross series commencing with the 2003 supercross season.

130.     Thereafter, AMA Pro Racing and Clear Channel entered into an agreement allocating (i) the U.S. market for supercross sanctioning to AMA Pro Racing, and (ii) the U.S. market for

29

supercross promotion to Clear Channel. In other words, Clear Channel and AMA Pro Racing entered an agreement not to compete with each other in the respective markets for supercross sanctioning and supercross promotion. On April 12, 2002, Clear Channel and AMA Pro Racing announced that they had entered into a seven year agreement for the 2003-2009 AMA Supercross seasons. According to the their press release, the Clear Channel/AMA Pro Racing agreement provides that AMA Pro Racing will sanction all supercross races in the U.S. and that Clear Channel will produce and promote such races in the United States.

131. Clear Channel and AMA Pro Racing have, thus, entered into a market allocation agreement that constitutes a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

132. As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, and Paradama Productions, Inc. d/b/a AMA Pro Racing, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

### Count X

**Violation of Section 1 of the Sherman Act - Unreasonable Restraint of Trade**
**(Against Clear Channel and AMA Pro Racing)**

133. JamSports repeats, realleges and incorporates by reference Paragraphs 128-132 as this Paragraph 133.

134.     Clear Channel and AMA Pro Racing's agreement not to compete with each other in the respective U.S. markets for supercross promotion, on the one hand, and supercross sanctioning, on the other, is a contract, combination or conspiracy that unreasonably restrains competition in such relevant markets or submarkets, and violates Section 1 of the Sherman Act (15 U.S.C. § 1).

135.     As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, and Paradama Productions, Inc. d/b/a AMA Pro Racing, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

### Count XI (Alternative Claim)

#### Violation of Section 2 of the Sherman Act - Monopolization – Foreclosing Access to Essential Facilities (Against Clear Channel)

136.     JamSports repeats, realleges and incorporates by reference Paragraphs 105-115 as this Paragraph 136. JamSports pleads this count in the alternative to any claims alleged in this Amended Complaint with respect to which there are necessary allegations that are inconsistent with any allegation in this count.

137.     With respect to the relevant geographic submarkets, the aforementioned stadiums constitute essential facilities in that there are no reasonable substitute venues in which to present supercross races.

31

138.    By foreclosing competitors, including JamSports, from gaining reasonable access to such stadiums, Clear Channel has monopolized the relevant market for the promotion of supercross, in the relevant geographic submarkets in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

139.    As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

## Count XII (Alternative Claim)

### Violation of Section 2 of the Sherman Act - Attempt to Monopolize – Foreclosing Access to Essential Facilities (Against Clear Channel)

140.    JamSports repeats, realleges and incorporates by reference Paragraphs 136-139 as this Paragraph 140. JamSports pleads this count in the alternative to any claims alleged in this Amended Complaint with respect to which there are necessary allegations that are inconsistent with any allegation in this count.

141.    Clear Channel engaged in the foregoing anticompetitive conduct with the specific intent of monopolizing the relevant market for the promotion of supercross on a national basis and/or on a geographic-submarket-by-geographic-submarket basis.

142.    This conduct constitutes an attempt to monopolize the relevant market for supercross promotion on a national basis and/or on a geographic submarket-by-geographic submarket basis, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

32

143.    As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

## Count XIII (Alternative Claim)

### Violation of Section 2 of the Sherman Act - Conspiracy to Monopolize – Foreclosing Access to Essential Facilities (Against Clear Channel)

144.    JamSports repeats, realleges and incorporates by reference Paragraphs 136-139 as this Paragraph 144. JamSports pleads this count in the alternative to any claims alleged in this Amended Complaint with respect to which there are necessary allegations that are inconsistent with any allegation in this count.

145.    Clear Channel conspired with and/or entered into anticompetitive agreements or understandings with the aforementioned stadiums to foreclose competitors from gaining reasonable access to such essential facilities for the purpose of monopolizing the relevant geographic submarkets for the promotion of supercross.

146.    These conspiracies or agreements constitute a conspiracies to monopolize the relevant geographic submarkets for supercross promotion in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

147.    As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

### Count XIV (Alternative Claim)

**Violation of Section 1 of the Sherman Act –
Unreasonable Restraint of Competition - Foreclosing Access to Essential Facilities
(Against Clear Channel)**

148.    JamSports repeats, realleges and incorporates by reference Paragraphs 136-139 as this Paragraph 148. JamSports pleads this count in the alternative to any claims alleged in this Amended Complaint with respect to which there are necessary allegations that are inconsistent with any allegation in this count.

149.    Clear Channel entered into contracts, combinations, or conspiracies with the aforementioned stadiums to foreclose competitors from gaining reasonable access to such essential facilities for the purpose and with the effect of unreasonably restraining competition in the relevant geographic submarkets for the promotion of supercross.

150.    These anticompetitive contracts, combinations or conspiracies violate Section 1 of the Sherman Act (15 U.S.C. § 1).

151.    As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

34

## Count XV

### Violation of Section 2 of the Sherman Act –
### Monopolization of Market for Supercross Promotion (Against Clear Channel)

152.     JamSports repeats, realleges and incorporates by reference Paragraphs 1-104 as this Paragraph 152.

153.     Clear Channel has significant market power in the relevant market for supercross promotion in the U.S..

154.     Clear Channel has utilized unfair and anticompetitive means to eliminate its competitors in such market including, *inter alia*, by the conduct specifically alleged herein.

155.     Clear Channel has thereby maintained its own dominance and foreclosed competition in such market.

156.     Clear Channel's conduct violates Section 2 of the Sherman Act (15 U.S.C. § 2).

157.     As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

## Count XVI (Alternative to Count XV)

### Violation of Section 2 of the Sherman Act –
### Monopolization of Market for Specialty Motor Sports (Against Clear Channel)

158.     JamSports repeats, realleges and incorporates by reference Paragraphs 1-104 as this Paragraph 158.

159.    Clear Channel has significant market power in the relevant market for the promotion of specialty motor sports in the U.S..

160.    Clear Channel has utilized unfair and anticompetitive means to eliminate its competitors in such market including, *inter alia*, by the conduct specifically alleged herein.

161.    Clear Channel has thereby maintained its own dominance and foreclosed competition in such market.

162.    Clear Channel's conduct violates Section 2 of the Sherman Act (15 U.S.C. § 2).

163.    As a result of Clear Channel's anticompetitive conduct, JamSports has been injured in its business and property and is entitled to damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendants Clear Channel Communications, Inc., SFX Entertainment, Inc. d/b/a Clear Channel Entertainment, and SFX Motor Sports, Inc., d/b/a Clear Channel Entertainment - Motor Sports, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, trebled pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), together with its attorney's fees and costs, and for such other and further relief as this Court deems just and appropriate.

## VIII.  Jury Demand

Plaintiff respectfully request a jury trial as to all claims herein so triable as of right.


Dated this 3rd day of September, 2002.

Respectfully submitted,

**JAMSPORTS AND ENTERTAINMENT, LLC.**

By: _____

One of its Attorneys


James D. Roberts
Margaret C. Egan
PIPER MARBURY RUDNICK & WOLFE
18th Floor
203 North La Salle Street
Chicago, Illinois  60601-1293
(312) 368-4000

Bruce S. Sperling
Paul E. Slater
Greg Shinall
SPERLING & SLATER
55 W. Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 641-3200

# *See Case File for Exhibits*