# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2298 | **DATE** | 4/15/2003 |
| **CASE TITLE** | Jamsports and Entertainment vs. Paradama Production, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ___.

(3) ☐ Answer brief to motion due ___. Reply to answer brief due ___.

(4) ☐ Ruling/Hearing on ___ set for ___ at ___.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ___ set for ___ at ___.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ___ set for ___ at ___.

(7) ☐ Trial[set for/re-set for] on ___ at ___.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ___ at ___.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons set forth on the attached Memorandum Opinion and Order, the Court grants Defendant's motion to dismiss [docket item 21-1] as to Counts 9 and 10 of the amended complaint. The motion is otherwise denied. JamSports' motion to strike [31-1] is denied. Defendants are ordered to answer all remaining claims on or before April 29, 2003.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | APR 2 1 2003 date docketed | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | APR 2 1 2003 date mailed notice | |
| DS | courtroom deputy's initials | | |

U.S. DISTRICT COURT
CLERK
03 APR 19 AM 11:48

Date/time received in central Clerk's Office                 mailing deputy initials

| | |
|---|---|
| JAMSPORTS AND ENTERTAINMENT, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> PARADAMA PRODUCTIONS, INC. d/b/a AMA PRO RACING, CLEAR CHANNEL COMMUNICATIONS INC., SFX ENTERTAINMENT, INC. d/b/a CLEAR CHANNEL COMMUNICATIONS INC., SFX MOTOR SPORTS, INC. d/b/a CLEAR CHANNEL ENTERTAINMENT - MOTOR SPORTS, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 02 C 2298 |

**DOCKETED**

APR 2 1 2003

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This case is about "supercross": championship-level, dirt track stadium motorcycle racing. JamSports and Entertainment LLC, a sporting events promoter, has sued AMA Pro Racing, a motorcycle sports sanctioning body, for allegedly reneging on a deal that would have given JamSports the right to produce and promote the "AMA Supercross Series"[1] for the 2003-2009 racing seasons. JamSports has also sued Clear Channel Communications Inc. and two of its subsidiaries (which we will refer to collectively as "Clear Channel") for tortious interference with contract, alleging that they carried on illicit negotiations with AMA Pro and eventually wrested away from JamSports the Supercross promotion rights it claims to have acquired.

---

[1] The AMA Supercross Series consists of a series of dirt track motorcycle races held in large indoor and outdoor stadiums throughout the U.S. each year from January until May. Cmplt. ¶18.

JamSports has also sued Clear Channel for violations of §§ 1 and 2 of the Sherman Act. It alleges that Clear Channel enjoys monopoly control over the supercross promotion market and has leveraged its power in the concert promotion and media markets to exclude potential supercross promotion competitors like JamSports from securing deals with stadiums and sponsors essential to promoting the sport. The case is now before the court on the Clear Channel defendants' motion to dismiss.

## Factual Background

The facts alleged in JamSports' amended complaint, which we regard as true for purposes of this motion, *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002), are as follows. AMA Pro holds itself out as the owner and sanctioning body for the AMA Supercross Series. Cmplt. ¶18. AMA Supercross is a valuable franchise, generating approximately $40 million in annual revenues, including gate receipts, ancillary revenues, sponsorships and television rights. *Id.* ¶19. From 1997 through 2002, Clear Channel (and companies that it subsequently acquired) promoted the series, but its contract with AMA Pro was set to expire at the conclusion of the 2002 racing season. *Id.* In the summer of 2001, AMA Pro began soliciting bids from other promoters, including JamSports, for the purpose of entering into an agreement to promote AMA Supercross for the 2003 season and beyond. *Id.* ¶20.

### Contract Negotiations

On November 2, 2001, AMA Pro and JamSports entered into an agreement under which JamSports agreed to produce and promote AMA Supercross for the 2003-2009 seasons. *Id.* ¶21. This "First Agreement," essentially a letter of intent, laid out several terms and conditions for a later transaction that parties agreed to undertake, including: (1) a provision granting JamSports

2

exclusive rights to produce and promote AMA Supercross in North America, (2) financial terms granting AMA Pro the greater of 8% of gross gate receipts or 30% of the net income from each Supercross event, and (3) an agreement to share revenues generated by event sponsorship, product merchandising, and media and marketing deals. *Id.* ¶¶ 23-25. The First Agreement also provided that JamSports would advance to AMA Pro a non-refundable amount of $3 million as general working capital to support the creation of a successful media and televison series. *Id.* ¶ 26; Pl's Ex. A (First Agreement) at 3. But none of these terms were immediately binding. Rather, JamSports and AMA Pro agreed to a ninety day period of exclusive negotiations during which the parties were obligated to use their best efforts to negotiate the remaining terms of the deal in good faith. Cmplt. ¶¶ 30-31, 33; Pl's Ex. A at 6. They also promised to protect the confidentiality of their business relationship, and to that end the First Agreement contained a binding obligation prohibiting either party from disclosing the terms of their proposed deal. *Id.*; Cmplt. ¶ 32.

On November 5, 2001, AMA Pro sent a letter to several motor sports venues announcing its partnership with JamSports and advising the venues that JamSports had exclusive authorization to negotiate with the venues on AMA Pro's behalf. Cmplt. ¶ 34; Pl's Ex. B. On November 6, AMA Pro issued a press release announcing that it selected JamSports as its new promotion partner for the AMA Supercross series. Cmplt. ¶ 35; Pl's Ex. C. In turn, JamSports began taking steps to promote AMA Supercross and to prepare for the 2003 season. In reliance upon AMA Pro's representations and its agreement to negotiate exclusively and in good faith with JamSports, JamSports carried out negotiations with the Indianapolis Motor Speedway for television coverage of AMA Supercross events, and on December 7, 2001 it announced a

television partnership with Speedvision, a 24-hour cable network devoted to motor sports. Cmplt. ¶ 37; Pl's Ex. E. Further, JamSports alleges that it began negotiating with marketing, radio, merchandising, and sponsorship entities, incurring substantial expenses in the process. Cmplt. ¶ 38. JamSports also claims to have committed extensive resources to ensure that its infrastructure would be sufficient to support its partnership with AMA Pro, and it alleges that AMA Pro staff moved into office space that JamSports created for them. *Id.* ¶ 40.

The parties' business relationship, however, did not develop as planned. On January 30, 2002, two days before the expiration of the agreed period of exclusive negotiations, AMA Pro contacted JamSports and proposed certain modifications to the deal that the parties had outlined up to that point. *Id.* ¶ 42. According to JamSports, AMA Pro indicated that it would accept the "form and content" of the promotion agreement once those final modifications were included. *Id.* In response, JamSports prepared a revised draft of the agreement reflecting AMA Pro's requested changes and forwarded the draft to AMA Pro for its review. *Id.* ¶ 43. But, JamSports alleges, AMA Pro delayed concluding the transaction. By a separate agreement dated February 1, 2002, the parties agreed to extend the period of exclusive negotiations until February 5, 2002. *Id.* ¶ 44. At the end of that period JamSports still had not received word from AMA Pro regarding the revised draft. On February 5, 2002, and again on February 8, 2002, JamSports sent letters to AMA Pro "confirming its acceptance" of all of AMA Pro's modifications and notifying AMA Pro that it was "ready willing and able to sign the Promotion Agreement." *Id.* ¶¶ 45-46; Pl's Exs. H, I. JamSports alleges that as of the time it accepted AMA Pro's proposed modifications, there were no outstanding issues between the parties with respect to the promotion agreement. *Id.* ¶ 47.

According to JamSports, on February 14, 2002, AMA Pro finally approved the promotion agreement. *Id.* ¶ 48. But the two parties never signed a written contract. To the contrary, AMA Pro eventually signed a deal with Clear Channel, granting it the right to promote the AMA Supercross Series for the 2003-2009 seasons. By JamSports' account, AMA Pro had been negotiating with Clear Channel all along, in breach of its obligation to negotiate exclusively and in good faith with JamSports. JamSports alleges malfeasance on Clear Channel's part as well. JamSports contends that Clear Channel knew of JamSports' exclusive negotiating rights, yet made numerous improper contacts with AMA Pro, including written and oral proposals regarding the 2003 Supercross season. *Id.* ¶ 52. As a result of this alleged interference, JamSports maintains that it was deprived of the Supercross promotion rights that it believed it had been promised.

## Antitrust Allegations

At the same time that the parties were battling over the contract to promote the AMA Supercross Series, JamSports alleges, Clear Channel was using anticompetitive tactics to exclude JamSports from entering the supercross promotion market altogether. According to JamSports, presenting a successful supercross series requires a promoter to secure key stadiums in certain metropolitan areas where the sport has an established fan base. *Id.* ¶ 57. With this in mind, JamSports alleges, Clear Channel set out to prevent potential competitors, including JamSports, from obtaining access to these essential facilities. *Id.* Specifically, JamSports alleges that Clear Channel was able to use its power in other markets- the markets for promoting concerts and specialty motor sports events, along with radio, television and outdoor advertising markets—as leverage to coerce stadiums into exclusive deals for promoting supercross. *Id.* ¶ 60. As a result

5

of Clear Channel's allegedly anticompetitive conduct, JamSports was unable to schedule supercross events in 12 key metropolitan arenas: Edison Field (Anaheim), Texas Stadium (Dallas), the Silverdome (Detroit), Ford Field (Detroit), Reliant Stadium (Houston), Sam Boyd Stadium (Las Vegas), Pro Player Stadium (Miami), the Metrodome (Minneapolis), Bank One Ballpark (Phoenix), Rice-Eccles Stadium (Salt Lake City), Qualcomm Stadium (San Diego), and America's Center (St. Louis). *Id.* ¶ 61. JamSports alleges that many of these stadiums expressly cited Clear Channel as their reason for rejecting JamSports' promotion proposals. *Id.*

JamSports maintains that its inability to secure these key venues contributed to its failure to finalize a deal with AMA Pro to promote the AMA Supercross Series. Though JamSports was able to put together a supercross event schedule by securing contracts with alternate arenas, and stadiums in other cities, Clear Channel's exclusive rights to promote supercross in the Series' established venues proved decisive. JamSports alleges that Clear Channel used its dominance over these stadiums to threaten AMA Pro with the prospect of a competing supercross series—without AMA Pro's sanction—and that AMA Pro renounced its deal with JamSports to prevent that possibility. *Id.* ¶¶ 62-65.

The complaint further states that Clear Channel leveraged its dominance over the concert, specialty motor sports, and media markets, along with its exclusive deals with key stadiums, to discourage the motorcycle manufacturers who routinely sponsor supercross teams from doing business with JamSports. Moreover, JamSports alleges that Honda, Kawasaki, Suzuki, and other motorcycle manufacturers have representatives on the board of directors of the American Motorcyclist Association (AMA Pro's not-for-profit parent company) and that Clear Channel was able to leverage its influence over these companies, through the AMA, to pressure AMA Pro

6

out of its deal with JamSports. *Id.*

Finally, JamSports characterizes Clear Channel's final deal with AMA Pro as an anticompetitive pact, designed with the intent to exclude any other promoter or any other sanctioning body from producing a supercross series capable of competing with AMA Supercross. It alleges that, facing the possibility of JamSports' entry into the market and the prospect of JamSports' gaining AMA Pro's sanction, Clear Channel leveraged all of its influence to obtain a deal with AMA Pro that guaranteed each party's continuing monopoly power over supercross. *Id.* ¶ 66-70.

Based on its factual allegations, JamSports asserts two counts of tortious interference with contract against Clear Channel (counts 3 and 4). In addition, JamSports asserts twelve separate violations of the Sherman Act (counts 5-16). Clear Channel moves to dismiss each of these claims.[2] JamSports' breach of contract claims (counts 1 and 2) are not at issue in Clear Channel's motion.

**Analysis**

In considering Clear Channel's motion to dismiss, we accept as true the amended complaint's well pleaded factual allegations and draw all reasonable inferences from those allegations in favor of JamSports. *Thompson*, 300 F.3d 750, 753 (7th Cir. 2002). We will dismiss a claim only if it appears beyond doubt that JamSports can prove no set of facts in

---

[2] Clear Channel Communications Inc., and its subsidiary, SFX Entertainment, Inc. seek to be dismissed as improper defendants in this suit. They contend that JamSports' complaint refers only to conduct allegedly undertaken by another of Clear Channel's subsidiaries, SFX Motor Sports, Inc. We agree with JamSports, however, that its allegations properly apply to each of these named defendants. JamSports has alleged that Clear Channel and its subsidiaries hold themselves out as an integrated enterprise, and that they have leveraged their collective power in various media and entertainment markets to gain anticompetitive advantages in violation of the Sherman Act. Cmplt. at 16, n.2.

support of its claim which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46

(1957); *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967, 972 (7th Cir.

1995). We first address the sufficiency of JamSports' antitrust allegations.

**I.     Antitrust Claims (counts 5-16)**

JamSports asserts 12 separate claims under the Sherman Act: four counts of

monopolization (counts 5, 11, 15, and 16), two counts of attempted monopolization (counts 6

and 12), and two counts of conspiracy to monopolize (counts 7 and 13) under 15 U.S.C. § 2,

along with four counts based on §1 of the Act (counts 8, 9, 10, and 14). Most of these claims are

based on a few overlapping antitrust theories: leveraging of monopoly power (counts 5-7),

exclusion from essential facilities (counts 11-14), exclusive dealing (count 8), and market

allocation (counts 9-10).[3] Clear Channel disputes some of the labels that JamSports has applied

to describe and distinguish its antitrust claims. The parties agree that counts 9 and 10 allege a

market allocation scheme in violation of § 1. But Clear Channel characterizes each of the claims

alleged in counts 5-8 and 11-16 as "essential facilities" claims, and argues that JamSports has

failed to allege facts sufficient to establish that any of stadiums that Clear Channel allegedly

dominates are essential to promoting supercross. With respect to all of JamSports' antitrust

claims, Clear Channel argues that JamSports has failed to allege a legally sufficient relevant

product market. It contends that the alleged "market for the promotion of supercross" is

implausibly narrow, and that JamSports' proposed alternative, the "market for the promotion of

specialty motor sports presented in stadiums and arenas" is artificial and incoherent. Because it

---

[3] JamSports characterizes counts 15 and 16 as "general monopolization" claims under § 2 of the Sherman Act.

8

affects every antitrust issue currently before the Court, we begin our analysis with JamSports'
relevant market allegations.

A.      *Relevant Market*

In order to state a claim for monopolization under § 2 of the Sherman Act, JamSports
needs to allege "'(1) the existence of monopoly power in the relevant market and (2) the willful
acquisition or maintenance of that power as distinguished from growth or development as a
consequence of a superior product, business acumen, or historic accident.'" *Elliot v. United
Center*, 126 F.3d 1003, 1004-05 (7th Cir. 1997) (quoting *United States v. Grinnell Corp.*, 384
U.S. 563, 570-71 (1966)). To state a claim under section 1 of the Sherman Act JamSports must
allege: (1) a contract, combination or conspiracy and (2) a resultant unreasonable restraint of
trade in the relevant market. *MCM*, 62 F.3d at 972 n.7. Both types of claims require JamSports
to identify the relevant market in which Clear Channel is alleged to have engaged in
anticompetitive conduct. In its complaint, JamSports advances three possible definitions of the
relevant market in this case: (1) a national market for the promotion of supercross, (2) geographic
submarkets for the promotion of supercross in each of 11 metropolitan areas: Phoenix, Los
Angeles, San Diego, San Francisco, Daytona, Miami, Indianapolis, Detroit, Minneapolis, St.
Louis, Las Vegas, Dallas, Houston, Salt Lake City, and (3) a national market for the promotion of
specialized motor sports events presented in stadiums and arenas.

Clear Channel contends that each of these alleged relevant markets is implausible and
lacks factual support. First, it insists that the idea of a market for promoting supercross is
contrived, arguing that JamSports, in an effort to claim Clear Channel is a monopolist, has
defined the market as consisting of the dirt-track stadium motorcycle racing series that Clear

Channel has produced since 1997. On this score, Clear Channel compares JamSports' market allegations with those rejected in a series of cases in which antitrust plaintiffs sought to limit the relevant market to a single product, brand, or narrow class of customers. *See, e.g., Elliot,* 126 F.3d at1005 (7th Cir. 1997); *Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.,* 300 F.3d 620, 628 (5th Cir. 2002); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.* 124 F.3d 430, 436 (3rd Cir. 1997); *Rohlfing v. Manor Care Inc.,* 172 F.R.D. 330 (N.D. Ill. 1997). Clear Channel also argues that a market limited to supercross promotion cannot be justified by reference to principles of "reasonable interchangeability" and "cross elasticity of demand." *See United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377 (1956); *Brown Shoe Co. v. United States,* 370 U.S. 294 (1962). It insists that JamSports is required to identify economically meaningful distinctions between supercross and possible market substitutes such as outdoor motorcycle racing, or motor sports generally, and that it has failed to do so. Clear Channel raises these same arguments concerning JamSports' geographic submarket allegations and adds the further objection that the concept of a relevant metropolitan sub-market for supercross cannot be reconciled with JamSports' description of supercross as a nationwide series of races. Finally, Clear Channel argues that JamSports' alleged alternative market, promotion of "specialty motor sports in stadiums and arenas," is implausible as a matter of law. It contends that a market for specialty motor sports in stadiums, which JamSports defines to include both supercross and monster truck events but not outdoor automobile racing is simply illogical and should be rejected on its face.

There is no question that JamSports is required to allege a plausible relevant market. As Clear Channel notes, markets are defined by reference to cross elasticity of demand and reasonable interchangeability with other products. *See DuPont,* 351 U.S. at 393 ("Determination

of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another"). The boundaries of a market or submarket are determined "by examining such practical indicia as industry or public recognition of the submarket [or market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

Market definition, however, involves a deeply fact-intensive inquiry, *see Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (9th Cir. 2001); *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery.") (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992)), and for this reason a court must be hesitant to grant a motion to dismiss for failure to plead a relevant market. *Todd*, 275 F.3d at 199-200; *Queen City Pizza, Inc.*, 124 F.3d at 436. On this point, the Seventh Circuit has emphasized that "an antitrust plaintiff need not 'include the particulars of his claim' to survive a motion to dismiss." *MCM*, 62 F.3d at 976 (quoting *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 782 (7th Cir. 1994), and reversing dismissal of antitrust claim for failure to plead specific facts justifying the alleged relevant market). Though JamSports must eventually convince a trier of fact that a market for the promotion of supercross or "specialty motor sports in stadiums" actually exists, at the pleading stage, we need only find it conceivable that JamSports could prove a set of facts supporting the relevant market definitions that it has alleged. *Id.* at 977.

1.    National market for promoting supercross

JamSports' principal allegation is that there is a national market for promoting supercross. It asserts that the sport has an established fan base, with seasonal events held in several metropolitan areas each year. Cmplt. ¶ 18. It claims that the supercross series currently sanctioned by AMA Pro and promoted by Clear Channel generates around $40 million in annual revenues. *Id.* It alleges that the sport is televised and attracts sponsorship deals with motorcycle manufacturers. *Id.* at ¶¶ 18, 64. Taking these allegations as true, and drawing reasonable inferences in JamSports favor, a fact finder reasonably could find that there exists an economically significant relevant market for the national promotion of supercross. As JamSports has defined it, supercross is a sport with a recognized season, championship competition, and specialized sponsors. Though the question may well arise as to whether the consumer demand for supercross is interchangeable with the demand for other types of motor sports, that is a factual issue that cannot be determined at this stage of the litigation. JamSports is not required to anticipate and refute in its complaint all possible market substitutes.

Moreover, we are not persuaded that the alleged market identified by JamSports bears resemblance to those rejected as implausible in the "single brand or product" cases cited in Clear Channel's brief. In those cases, proposed relevant markets were rejected out of hand because they were alleged to encompass tiny geographic areas, a narrow class of customers, or the defendant's own product. In *Elliot*, for example, the Seventh Circuit rejected a group of peanut vendors' allegations that the United Center had monopolized the sale of food inside the arena. *Elliot*, 126 F.3d at 1003-04. In *Queen City Pizza*, the plaintiff, a Domino's Pizza franchisee, alleged that Domino's Pizza, Inc. had monopolized the market for the ingredients, supplies,

12

materials and distribution services used in the operation of its own stores. *Queen City Pizza*, 124 F.3d at 437. The Third Circuit rejected the proposed relevant market at the pleading stage because the plaintiff acknowledged that although he was bound by contract to use Domino's supplies, the dough, tomato sauce, and paper cups used and approved by Domino's were commercially interchangeable with the dough, sauce and cups available from other suppliers. *Id.* at 438. In *Apani Southwest*, the court rejected the plaintiff's attempt to limit the relevant market for the sale of bottled water to twenty-seven City-owned facilities in Lubbock, Texas. 300 F.3d at 628-633. Relying in part on the district court's review of the pleadings, which revealed that plaintiff regularly sold bottled water throughout Lubbock to customers other than the City, the Fifth Circuit concluded that the alleged market was artificially narrow and did not correspond to commercial realities of the industry. *Id.* Similarly, in *Rohlfing*, Judge Aspen concluded that the relevant market alleged--sale of pharmaceuticals to residents of Manor Care-network nursing facilities—was legally inadequate because it improperly defined the market in terms of a single, narrow class of customers. 172 F.R.D. at 345-346.

The market allegations now before the court are not so obviously contrived or narrow. First, Clear Channel does not own the sport of supercross. We are therefore not convinced that JamSports is attempting to characterize Clear Channel as monopolist over its own product. JamSports defines the market for supercross promotion in terms of a sanctioning body (AMA Pro), an established fan base (national and regional), recognized stadiums, and commercial sponsorships. Clear Channel's promotion efforts may have shaped the boundaries of the market as JamSports describes it, but that does not mean that the market does not exist or that it has been contrived for this lawsuit. Second, we cannot say at this point in the litigation that the alleged

market for supercross is an obviously impermissible subset of a larger market for motorcycle racing or live motor sports events generally at least not in the way that a market for pharmaceutical sales to "Manor Care-network nursing home patients" is clearly part of a larger market for pharmaceutical sales to nursing home patients. JamSports has not tethered its market allegations to a narrow class of customers. To the contrary, it has characterized supercross as a recognized sport with a sizeable following.

JamSports' pleadings and exhibits do appear to reveal a consumer connection between the market for supercross as alleged and the market for other motor sports. *See* Pl's Exs. D (Indianapolis Motor Speedway press release), E (Speed Channel press release), J (Promotion Agreement, ¶ 18(b)). But we do not share Clear Channel's view that an independent market for championship level dirt track motorcycle racing in stadiums is inherently implausible. As we have discussed, we cannot determine at the pleading stage that among motor sports fans or commercial sponsors, supercross racing is reasonably interchangeable with other types of motorcycle racing or motor sports events. JamSports has not "pleaded itself out of court" by acknowledging that the Speed Channel cable network appeals to fans of both supercross and "AMA Superbikes," Pl's Ex. E., or by disclosing that its proposed agreement with AMA Pro included a clause prohibiting JamSports from competing with it in the area of "motorcycle sports events." Pl's Ex. J (Promotion Agreement, ¶18(b)). These documents suggest some cross-elasticity of demand between supercross and possible market substitutes, but they do need lead inexorably to the conclusion that no supercross market exists.

Clear Channel also argues that JamSports' alternative relevant market allegations undermine its claim that a market for supercross exists. As facts in the case develop, it

14

presumably will become clear whether the demand for supercross is reasonably interchangeable with the demand for "specialized motor sports events in stadiums." But JamSports is entitled to plead in the alternative, *see* Fed. R. Civ. P. 8(e)(2), and for now it may allege, albeit perhaps inconsistently, that there are economically significant markets for both supercross and specialized stadium motor sports events generally.

2.    Geographic submarkets for promoting supercross

We reject Clear Channel's suggestion that the concept of a geographic submarket for supercross is in tension with JamSports' allegations that the sport is produced as a nationwide series of races. Again, the federal rules permit a plaintiff to plead in the alternative. *Id.* In any event, courts have recognized geographic submarkets for professional football and basketball in specific metropolitan areas even though the games presented in those submarkets formed part of a larger league enterprise. *See, e.g., Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986) (relevant market for presentation of live professional basketball in Chicago metropolitan area); *Hecht v. Pro Football, Inc.*, 570 F.2d 982 (D.C. Cir. 1977) (relevant market for professional football in Washington, D.C.). In the same way, a market for promoting the supercross series event in Anaheim, for example, is a plausible market for competition among promoters within a larger relevant market for the promotion of supercross nationwide.

The problem for JamSports, however, is that it does not allege that it attempted to enter any of the submarkets it identifies, apart from its overall effort to promote a nationwide supercross series. This is more an issue of standing than relevant market sufficiency. In order to maintain a private antitrust action, a plaintiff must allege an antitrust injury: an injury "of the type of loss that the claimed violations ... would be likely to cause." *Serfecz v. Jewel Food*

*Stores,* 67 F.3d 591, 597 (7th Cir. 1995) (quoting *Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)). Though a plaintiff can allege an antitrust injury based on the unlawful efforts of its competitor to exclude it from a valid market to which it sought access, *see Fishman,* 807 F.2d at 531-535, JamSports never sought to compete in the alleged geographical submarkets. Instead, it sought contracts with key stadiums in various cities as a means of entering a national market. *See* Cmplt. ¶¶ 57, 61-62. JamSports is entitled to allege that Clear Channel's efforts to exclude it from reaching the supercross fan base in the eleven identified geographical submarkets constituted illegal anticompetitive conduct. But the relevant market for such a claim is the national market for the promotion of supercross.

3.      Market for promotion and production of "specialized motor sports events presented in    stadiums and arenas."

JamSports has alleged an alternative market for the promotion of "specialized" stadium motor sports events, which it characterizes as including "supercross, arena cross, monster truck events, freestyle motocross events and drag racing." Cmplt. ¶16. Clear Channel argues that this market is implausible as well, leveling many of the same objections it has raised in opposition to the alleged market for the promotion of supercross. It contends that JamSports has simply drawn a line around Clear Channel's motor sports promotion business in order to characterize it as a monopolist. Further, it argues that the grouping together of stadium motorcycle racing, drag racing and monster truck events is arbitrary and without factual support. But here, as in its arguments for rejecting JamSports' primary market allegations, Clear Channel exaggerates the pleading requirements for antitrust plaintiffs. JamSports is entitled to state its market allegations generally, *see MCM,* 62 F.3d at 976-977, and we do not find it inconceivable that the stadium

16

motor sports that it identifies form a cognizable market. We decline to look behind JamSports'
allegations to discern whether the market that it proposes improperly excludes automobile racing
or improperly includes monster trucks. Those inquiries are a matter for later determination. *See*
*MCM*, 62 F.3d at 976 (citing *Eastman Kodak*, 504 U.S. at 481-82).

As we discussed in relation to the alleged market for promotion of supercross, however,
JamSports lacks standing to assert an antitrust claim based on Clear Channel's conduct within
any relevant market limited to a subregion within the United States. Thus, JamSports may not
base any of its claims solely on the theory that Clear Channel has monopolized the market for
promoting specialized stadium motor sports in specific "major metropolitan areas." Cmplt. ¶ 16.

B.      *Sherman Act §§ 1 and 2*

Though JamSports asserts twelve separate claims under the Sherman Act, its allegations
reveal a few basic theories of relief. First, in counts 5-7, JamSports alleges that Clear Channel
leveraged its dominant market power in the "concert, motor sports, and/or media markets" to
coerce key stadiums in several metropolitan areas to refuse to sign supercross deals with
JamSports, and that this anticompetitive conduct forced JamSports out of its deal with AMA Pro
and out of the market for promoting supercross. *Id.* ¶¶ 105-123. Based on these allegations,
JamSports asserts claims of monopolization, attempted monopolization, and conspiracy to
monopolize under § 2 of the Sherman Act.

Second, in count 8, JamSports alleges that Clear Channel entered into "exclusive dealing
contracts, combinations or conspiracies" with stadiums "for the purpose and with the effect of
unreasonably restraining competition in the relevant geographic submarkets for the promotion of
supercross." Here, JamSports asserts a claim under §1 of the Sherman Act. *Id.* ¶¶ 124-127.

17

Third, in counts 9 and 10, JamSports alleges a market allocation scheme based on Clear Channel and AMA Pro's alleged agreement not to compete with one another in "the respective markets for supercross sanctioning and supercross promotion." This alleged scheme forms the basis for two claimed violations of § 1 of the Act: an alleged *per se* violation, and an alleged "rule of reason" violation.

Fourth, counts 11-13 echo the allegations made in counts 5-7 that Clear Channel forced JamSports out of the supercross promotion market by foreclosing access to stadiums essential to producing the sport. *Id.* ¶¶ 136-147. In these counts, however, JamSports focuses on the stadiums as "essential facilities" rather than on Clear Channel's monopoly leveraging tactics. As in counts 5-7, it asserts claims for monopolization, attempted monopolization, and conspiracy to monopolize. In count 14, JamSports alleges an "essential facilities" claim under § 1 of the Act, stating that Clear Channel "entered into contracts, combinations, or conspiracies with stadiums to foreclose competitors from gaining access" with the purpose and effect of restraining commerce. *Id.* ¶¶ 148-150.

Finally, count 15 is a general monopolization claim under § 2 of the Sherman Act, alleging that Clear Channel has significant power in the relevant market for supercross promotion in the U.S., and that it has used anticompetitive means to maintain its dominance. Count 16 is identical to Count 15, except that it alleges Clear Channel's monopoly presence in the alternative market for specialty motor sports. *Id.* ¶ 158.

Clear Channel contends that counts 5-8 and 11-16 are all "essential facilities" claims under either §1 or §2 of the Act in that they depend on a determination that certain stadiums to which JamSports was denied access were indispensable to its bid to enter the market for

18

promoting supercross. Most of its argument is devoted to refuting the market significance of these supposedly "essential" venues. It recognizes counts 9 and 10 as attempting to allege a market allocation scheme and argues that these claims are inadequate as well. As the court reads the amended complaint, counts 5-8 and 11-14 are all based on a theory that Clear Channel leveraged its power in various markets to ensure that JamSports could not gain access to key stadiums in several cities where supercross is established and popular, and that these efforts forced JamSports out of the market for promoting supercross and allowed Clear Channel to maintain its market dominance. We agree with JamSports, however, that counts 15 and 16 allege monopolization generally, and we therefore address those claims separately.

1. Essential Facilities/Monopoly Leveraging

To state a claim for a § 2 Sherman Act violation under any theory, a plaintiff must allege (1) possession of monopoly power in the relevant market and (2) willful acquisition or maintenance of that power. *Elliot,* 126 F.3d at 1004-05. Section 1 claims, by contrast, require allegations of collective action: (1) a contract, combination or conspiracy and (2) a resultant unreasonable restraint of trade in the relevant market. *MCM,* 62 F.3d at 972 n.7. At least some of JamSports' claims in counts 5-8 and 11-14 adequately allege elements of each of these types of claims.

With respect to its § 2 claims, JamSports alleges that Clear Channel has monopoly power over the relevant market for promoting supercross. Cmplt. ¶ 112, 116, 120,136, 140, 144 (counts 5-7, 11-13). It further alleges that Clear Channel sought to maintain that power by coercing owners of essential facilities within the market to refuse to do business with competitors, including JamSports. *Id.* ¶¶ 105-111, 116, 120, 124, 140, 144 (counts 5-7, 11-13). In its § 1

19

claims, JamSports alleges that Clear Channel entered into contracts, combinations or conspiracies to exclude JamSports from the alleged essential facilities. *Id.* ¶¶ 124-125, 148-149.

Clear Channel makes three arguments in support of its motion to dismiss these claims. First, it argues that none of the stadiums that JamSports identifies is an essential facility with respect to its geographic area. Second, it contends that none of these stadiums is essential to the promotion of a nationwide series of supercross events. Third, Clear Channel insists that JamSports has failed to allege that it was actually denied access to these facilities since it only sought contracts to promote events between January and May. In consequence, it argues, JamSports cannot claim that Clear Channel has acted to maintain monopoly power over supercross, through collective action or otherwise.

We agree that for all practical purposes, JamSports must allege a valid essential facilities claim in order to proceed with the claims alleged in counts 5-8 and 11-14. The "monopoly leveraging" and "exclusive dealing" claims that JamSports asserts ultimately depend on a finding that JamSports was forced out of the market for promoting supercross. That finding, in turn, depends on a factual determination that the stadiums to which it was denied access were essential to the nationwide promotion of the sport. Accordingly, though we acknowledge that there may be differences between counts 5-8 and 11-14, we address Clear Channel's argument that all of these claims should be dismissed for failure to identify any truly essential facilities.

The Seventh Circuit has adopted a four element test for establishing an essential facilities claim. To state a claim, the plaintiff must allege "'(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the

20

facility.'" *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024 (7th Cir. 1988) (quoting *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1982)). The fourth factor is inapposite here. In the paradigmatic case, the alleged monopolist actually owns the facility alleged to be essential, and some cost-benefit analysis must be made to determine whether it is economically feasible for the monopolist to provide competitors with access. *See, e.g., Otter Tail Power Co. v. United States*, 410 U.S. 366, 381-82 (1973) (feasibility of regulated electric utility selling or transmitting power to competing municipal distributors); *MCI*, 843 F.3d at 1133 (feasibility of AT&T providing access to local distribution facilities essential to MCI's market participation). Here, however, JamSports contends that Clear Channel coerced third parties to refuse JamSports access to their allegedly essential facilities. We must therefore decide whether JamSports has properly alleged that (1) Clear Channel controlled the stadiums that JamSports identifies, (2) the stadiums were essential to promoting supercross, (3) JamSports was denied access to the stadiums. Clear Channel does not dispute the sufficiency of the allegations that it controlled the stadiums in question. Rather, it contends that JamSports does not properly allege that the stadiums were essential or that it was actually denied access to the stadiums.

To be essential, "'a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants.'" *Fishman*, 807 F.2d at 539 (quoting *Hecht*, 570 F.2d at 922). JamSports alleges that specific stadiums in eleven distinct metropolitan areas are essential facilities for the promotion of a national series of supercross races. It contends that these stadiums, for example, Edison Field in Anaheim, CA and the Metrodome in Minneapolis, MN,

traditionally host supercross events during the January-May supercross season, that an established fanbase has developed around events held in these stadiums, and that any successful supercross series must include events held in these stadiums. Cmplt. ¶¶ 57, 59, 61. It alleges that due to Clear Channel's alleged coercive tactics, it was unable to schedule events during the January-May supercross season in any of the essential stadiums it identifies. *Id.* ¶ 61. Further, it alleges that though it was able to cobble together a schedule of supercross races in alternative venues in key cities, and stadiums in other areas, it was unable to secure AMA Pro's sanction to produce AMA Supercross. *Id.* ¶¶ 62, 65. These allegations adequately identify essential facilities and JamSports' exclusion from them.

We are not persuaded by Clear Channel's arguments that JamSports has failed to meet its pleading burden. First, most of Clear Channel's arguments address the evidentiary sufficiency of JamSports' essential facilities claims. For example, Clear Channel contends that JamSports has not set forth facts confirming that there were no reasonable alternatives to the stadiums alleged to be essential. As we have discussed, however, an antitrust plaintiff is not required to bolster its allegations with particularized facts, *see MCM,* 62 F.3d at 976, let alone to negate in its complaint factual challenges that the defendant might raise. An essential facilities claim, like relevant market definition, requires factual development. Clear Channel's reliance on *Flip Side* illustrates this point. There, the plaintiff was unable to establish that the Rosemont Horizon was an essential facility for the promotion of arena-level concerts in the Chicago area. *Flip Side,* 843 F.2d at 1034. But the decision turned on findings made at the summary judgment stage revealing that several other stadiums in Chicago, including the International Amphitheatre and the UIC Pavilion, were adequate venues for arena-level concerts. *Id.* At the pleading stage, we cannot

22

make these types of findings, and we decline to look beyond the pleadings to take notice of alternatives to the stadiums that JamSports identifies.

Clear Channel also argues that JamSports was able to "assemble an AMA Supercross schedule by entering into contracts with other venues and in other cities," Cmplt. ¶ 62, and argues that this undermines the claim that any of the facilities were necessary to promoting supercross. We do not consider the fact that JamSports was able to assemble a schedule of alternative venues as the equivalent of an admission that the stadiums it identifies were non-essential. To the contrary, JamSports alleges that its proposed alternative schedule failed, as it was unable to obtain AMA Pro's sanction without securing a deal to promote supercross races in established forums.

We likewise reject Clear Channel's contention that JamSports has not properly alleged that booking events in the cities it identifies was necessary to produce a successful supercross schedule. Drawing all reasonable inferences in favor of JamSports, we are obliged to accept at this stage the claim that the alleged cities and stadiums identified by JamSports are indispensable hubs of fan support for supercross. The Promotion Agreement that JamSports negotiated with AMA Pro does not state otherwise, *see* Pl's Ex. J, Addend. A, §(a)(2) (supercross promotion contract renewal contingent on scheduling supercross events in 10 of the largest 35 markets in North America), and it is conceivable that without events in cities where the sport is most popular, a series of supercross races would fail. Moreover, JamSports alleges that its effort to schedule a supercross series in alternate cities failed to attract AMA sanctioning.

The only case that Clear Channel cites in support of dismissing an essential facilities claim at the pleading stage differs from this case in a few key respects. In *Paddock Publications,*

*Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996), the court dismissed the Daily Herald's §1 antitrust claim against the owners of the Chicago Tribune and the Chicago Sun-Times, who were alleged to have pushed the Herald out of the market for premium syndicated news features by signing exclusive deals with two major supplemental news services. The court emphasized the Daily Herald's admissions that there were three major competing supplemental news services in the market and that it had access to one of them. Here, by contrast, JamSports does not admit the feasibility of alternatives; in fact it alleges that its attempt pursue a supercross series in alternative venues failed. Further, the plaintiff's theory in *Paddock* depended on a finding that the defendants' exclusive contracts within a competitive market squeezed out smaller competition. *Id.* at 45-46. By contrast, JamSports has alleged that Clear Channel leveraged its power in certain markets to forestall competition in another market and that JamSports' exclusion from essential facilities was the product of coercion.

Alongside its contention that none of the alleged stadiums are essential to promoting supercross, Clear Channel argues that JamSports has failed to allege that it was actually denied access to these venues. This argument is based on the fact that JamSports alleges only that it was excluded from deals to present supercross events from January through May. Cmplt. ¶¶ 60-61. But JamSports specifically alleges that the supercross season runs from January through May and that AMA Pro sanctions racing during that time. *Id.* Moreover, we can conceive of reasons why dirt track motorcycle racing would be possible in these stadiums, many of which are also venues for professional football and baseball, only during the winter and early spring. JamSports' allegation that it was denied access to essential stadiums during these months is adequate.

We conclude that JamSports has stated valid antitrust claims under §§1 and 2 of the

24

Sherman Act on theories of monopoly leveraging,[4] exclusive dealing and foreclosure of access to essential facilities. As we discussed in our relevant market analysis, however, JamSports lacks standing to allege Sherman Act violations limited to any of the alleged geographic submarkets. To the extent that counts 5, 7, 11, 13 or 14 purport to state such a claim, those claims are dismissed.

### 2. General Monopolization

JamSports' antitrust claims do not all depend on its exclusion from allegedly essential stadiums. In Count 15, JamSports alleges that Clear Channel "has significant market power in the relevant market for supercross promotion in the U.S," and that it has maintained its dominance in that market though "unfair and anticompetitive means." The allegations in count 16 are identical, except that they refer to Clear Channel's conduct in the alternative relevant market for promotion of specialty motor sports. These counts incorporate all of the factual allegations in the complaint, including Clear Channel's alleged efforts to coerce AMA Pro and major motorcycle manufacturers into refusing to deal with JamSports. We agree with JamSports that these counts state claims under § 2 of the Sherman Act separate from its essential facilities claims; Clear Channel makes no argument to the contrary.

### 3. Market Allocation

In Counts 9 and 10, JamSports characterizes AMA Pro's supercross sanctioning contract with Clear Channel for the 2003-2009 seasons as a "market allocation agreement" in violation of

---

[4] We note that Clear Channel includes a paragraph in its reply challenging JamSports monopoly leveraging theory. It suggests that JamSports "leveraging market" allegations are vague and inadequately pleaded. Because it has failed to provide authority to support this position, and because it initially briefed the relevant market issue without any reference to the sufficiency of JamSports' monopoly leveraging allegations, we decline to address this issue.

§1 of the Sherman Act. In support of this claim, JamSports alleges that there are separate relevant markets for supercross sanctioning and supercross promotion and that Clear Channel and AMA Pro have agreed to divide these markets and to refrain from competing with each other within them. Cmplt. ¶¶ 128-130. We agree with Clear Channel that this does not state a cognizable antitrust claim. Market allocation schemes involve horizontal agreements between competitors in a market to refrain from competing with each other for consumers within some portion of that market. *See, e.g., Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) (agreement between former partners in personal injury practice not to advertise in each other's client territories). The allegations in counts 9 and 10 do not allege this kind of agreement. Rather, JamSports describes a deal between two companies at two different levels of production to deal exclusively with one another. Without more, this type of exclusive contract (the same type of agreement that JamSports sought to obtain from AMA Pro) is permissible. *See Paddock Publications Inc.*, 103 F.3d at 44-45. The allegation that Clear Channel's threatened entry into the supercross sanctioning market caused AMA Pro to abandon its deal with JamSports has been captured in its other antitrust claims and does not support a separate claim of improper market allocation.

## II.   Tortious Interference with Contract (counts 3 and 4)

Clear Channel has also moved to dismiss JamSports' tortious interference claims. Because JamSports' claims are based on two separate alleged contracts, we address them separately.

### 1.   The First Agreement

In Count 3, JamSports alleges that Clear Channel induced AMA Pro to breach its

agreement with JamSports to negotiate exclusively and in good faith toward a contract to promote AMA Supercross. To state a claim for tortious interference with contract, JamSports must allege: (1) the existence of a contract between JamSports and AMA Pro; (2) Clear Channel's awareness of the contract; (3) Clear Channel's intentional inducement of a breach; and (4) damages. *HPI Health Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill.2d 145, 156, 545 N.E.2d 672, 676 (1989). Clear Channel acknowledges that JamSports has alleged that it had a binding contract to negotiate exclusively and in good faith towards a promotion deal. Though Clear Channel denies that it knew of the contract at time of its alleged interference, that element is adequately pleaded. *See* Cmplt. ¶ 95. Clear Channel contends, however, that its alleged interference–among other things, contacts and oral and written proposals made to AMA Pro notwithstanding the agreement–cannot be considered inducement to breach. Clear Channel refers to a portion of the First Agreement, attached to the complaint, that imposes a duty to disclose any third party offers made to either JamSports or AMA Pro during their agreed period of exclusive negotiations. *See* Pl's Ex. A (First Agreement § 13). Because the parties contemplated the possibility of unsolicited third party offers, Clear Channel argues, any competing proposals it communicated to AMA Pro cannot be considered tortious. We agree with JamSports that this argument does not warrant dismissal of JamSports' claim. The notice requirement to which Clear Channel refers does not undermine the unambiguous language of the First Agreement providing for exclusive negotiations. Accepting as true JamSports' allegations that Clear Channel knew of the exclusive arrangement yet made its own pass at AMA Pro, the allegations of Clear Channel's contacts with AMA Pro are sufficient to state a claim of intentional inducement to breach.

Clear Channel also insists that JamSports' damages allegations are insufficient. It argues that its alleged interference with a letter of intent could not have proximately caused the 20 million dollars in damages that JamSports claims to have suffered as a result of losing its deal with AMA Pro. This argument is misplaced on a motion to dismiss. Under the law, JamSports is entitled to the forseeable and consequential damages of the breach, which may include the loss of the benefit of the contract. *See Venture Associates Corp. v. Zenith Data Systems Corp.*, 96 F.3d 275, 278 (7th Cir. 1996) (in case of bad faith, damages for breach of an agreement to negotiate may be the same as the damages for the breach of a final contract). We cannot say at this stage that its damage claim is deficient as a matter of law.

      2.      Promotion Agreement

In count 4, JamSports alleges that Clear Channel tortiously interfered with the Promotion Agreement allegedly accepted and approved by AMA Pro's Board of Directors. Clear Channel moves to dismiss this claim on the grounds that the Promotion Agreement was never a binding contract. It points to JamSports' complaint which acknowledges that a contract was never signed, Cmplt. ¶ 49, and refers the Court to the Promotion Agreement itself, Pl's Ex. J, which it characterizes as an unfinished, red-lined draft. Though we agree with Clear Channel that the alleged contract attached to JamSports' complaint appears unfinished, JamSports has sufficiently alleged the existence of a final and binding deal. It alleges that it corresponded with AMA Pro regarding the final terms of the Promotion Agreement, that AMA Pro agreed to accept the deal subject to certain modifications, that JamSports edited the proposal to reflect those modifications, and that it mailed a final deal to AMA Pro for its signature. Cmplt. ¶¶42-44. JamSports attaches to the complaint two letters from its attorneys in which it purports to accept

the AMA Pro's requested modifications. Pl's Exs. H, I. It further alleges that AMA Pro's board of directors approved the agreement in the form it appears on the document attached to the complaint. *Id.* ¶ 48. Accepting these allegations as true, JamSports has adequately alleged a meeting of the minds.

Clear Channel's most serious objection to count 4 is the argument that the alleged contract is unenforceable under Illinois' statute of frauds. Because the parties agree that Clear Channel and AMA Pro contemplated an agreement that could not be performed within a year, the Promotion Agreement falls within the statute. *See* 740 ILCS 80/1. Consequently, there must be a writing or series of writings that in combination reflect a final agreement, and one of these writings must be signed by AMA Pro. *See Bower v. Jones,* 978 F.2d 1004, 1008 (7th Cir. 1992). Clear Channel's argument does not support dismissal of count 4 for failure to state a claim. JamSports has attached to the amended complaint a copy of the alleged agreement and letters from its attorneys confirming its own approval of the deal. Pl's Exs. H, I, J. JamSports also alleges that AMA Pro's board of directors approved the same agreement it has attached to the complaint; it suggests in response to the motion to dismiss that discovery will lead to the production of a document or documents signed by a representative of AMA Pro confirming its approval of the deal. Though JamSports has not yet produced a document reflecting the approval by AMA Pro's board, it need not do so at the pleading stage. Drawing reasonable inferences in JamSports' favor, as we must at this stage, we conclude that JamSports' pleadings sufficiently allege the Promotion Agreement's enforceability.

### III.    JamSports' Motion To Strike

The court acknowledges JamSports' motion to strike the last paragraph of Clear

29

Channel's reply brief. Because nothing contained in that paragraph is essential to our resolution of Clear Channel's motion to dismiss, the motion to strike is denied as moot.

## CONCLUSION

For the reasons stated above, the Court grants Defendant's motion to dismiss [docket item 21-1] as to Counts 9 and 10 of the amended complaint. The motion is otherwise denied. JamSports' motion to strike [31-1] is denied. Defendants are ordered to answer all remaining claims on or before April 29, 2003.

MATTHEW F. KENNELLY
United States District Judge

Date: April 15, 2003