# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2298 | **DATE** | 8/19/2004 |
| **CASE TITLE** | Jamsports vs. Paradama Productions, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, the Court denies JamSports' motion for partial summary judgment on its antitrust claims ; and grants in part and denies in part JamSports' motion for summary judgment against AMA Pro-Paradama, AMA's motion for summary judgment, and Clear Channel's motion for summary judgment. JamSports' motion to strike venue affidavits and Clear Channel's motion to exclude the Baade's testimony are denied. Trial on the remaining claims remains set for November 15, 2004. Pretrial order is to be submitted 10/15/04. Pretrial conference set to 11/4/04 at 2:00. Status hearing set to 9/8/04 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | **Document Number** |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 2 3 2004 | |
| ✓ | Docketing to mail notices. | | date docketed | 186 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JAMSPORTS AND ENTERTAINMENT, LLC, )
)
            Plaintiff, )
)
    v. )     Case No. 02 C 2298
)
PARADAMA PRODUCTIONS, INC., et al. )
)
           Defendants. )



## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This case involves the promotion of Supercross, a championship dirt track stadium

motorcycle racing. JamSports and Entertainment, LLC, a sporting events promoter, sued

Paradama Productions, which does business as AMA Pro Racing, for allegedly breaching a

contract that would have given JamSports the right to produce and promote the AMA Supercross

Series for 2003-2009.[1] JamSports also alleges that by entertaining a competing proposal from a

subsidiary of Clear Channel Communications while negotiations were ongoing with JamSports

and by imposing conditions for approval that had not been discussed with JamSports, AMA Pro

breached a written agreement to negotiate with JamSports exclusively and in good faith.

JamSports also has sued Clear Channel Communications and two subsidiaries (all of which will

be referred to as Clear Channel) for tortious interference with contract for allegedly enticing

AMA Pro to contract with Clear Channel to produce the AMA Supercross Series for the 2003-

---

[1] "AMA" stands for the American Motorcyclist Association.

1

2009 seasons. Finally, JamSports alleges that Clear Channel's methods for obtaining the AMA contract constituted violations of §§ 1 and 2 of the Sherman Act.

More than a year ago, the Clear Channel defendants moved to dismiss JamSports' amended complaint. The Court dismissed Counts 9 and 10, which raised antitrust market allocation claims. *Jamsports and Entertainment, LLC, v. Paradama Productions, Inc.*, No. 02 C 2298, 2003 WL 1873563, at *14 (N.D. Ill. Apr. 15, 2003). The Court also dismissed Counts 5, 7, 11, 13 and 14 to the extent that they alleged monopolization or monopoly leveraging in a geographic submarket, as opposed to a national market for the promotion of supercross. *Id.*, 2003 WL 1873563, at *8, *13. JamSports then amended its complaint for a second time and restated Counts 5, 7, 9, 10, 11, 13 and 14. AMA Pro argues that the Court should dismiss Counts 9 and 10 of the Second Amended Complaint. These claims are identical to claims we dismissed in the Amended Complaint, and for this reason the Court dismisses them for the reasons previously stated. Clear Channel argues that Counts 7, 8, 11, 13 and 14 no longer remain in the case either because they allege monopolization of geographic submarkets only. Clear Channel Mot. for Summ. J. at n.2. JamSports has failed to respond to this argument. After reviewing the Second Amended Complaint, the Court agrees with Clear Channel that Counts 7, 8, 11, 13 and 14 are based on the geographic submarket theory that we have rejected. Therefore, those Counts are dismissed and are no longer a part of this case.

Clear Channel now moves for summary judgment on all of JamSports' remaining claims. AMA Pro seeks summary judgment on the breach of contract claims. JamSports seeks summary judgment on two issues that are part of its antitrust claims and on its breach of contract claims against AMA Pro. For the reasons stated below, the Court denies JamSports' motion regarding

2

the antitrust claims and grants in part and denies in part the remaining motions.

## Background

AMA Pro began sanctioning supercross races in the 1970s. Clear Channel entered the supercross promotion market through acquisitions. In 1996, PACE Motor Sports promoted all but one of the races in the AMA-sanctioned supercross series. SFX Entertainment bought PACE in 1998, and Clear Channel acquired SFX in 2000. With the acquisition of PACE and SFX, Clear Channel succeeded to their contract to produce the AMA-sanctioned supercross series for the 1997 to 2002 seasons. The contract required Clear Channel to hold the races from January to May. Since 1998, sixteen supercross races have been held each year, except for in 2001, when only fifteen races were held.

In May 1999, AMA Pro and Clear Channel began negotiating a new promotion contract for the 2003 season and beyond. While these negotiations were in process, AMA Pro began discussions with three other promoters, including JamSports in 2001. On November 2, 2001, AMA Pro and JamSports signed a letter of intent regarding the promotion of the AMA-sanctioned supercross series for the 2003-2009 seasons. The portions of the letter of intent that are relevant to the Court's decision read as follows:

> AMA Pro Racing, owner of the Supercross Series, and JamSports hereby express their intent to enter into an agreement to promote AMA Supercross events and undertake related sales and marketing matters. . . .
> 1. Framework. AMA Pro Racing and JamSports shall agree to produce and promote not less than fourteen (14) and up to a mutually agreed upon number of AMA Supercross events per season (currently January 1 through the first week of May) for a seven (7) year period beginning January 1, 2003, with an opportunity to extend the term based on criteria such as operating issues, financial issues, brand development and event attendance and such other criteria as to be further clarified by the parties hereto. . . .
> . . .

12. <u>Confidentiality</u>. AMA Pro Racing and JamSports each agree that the terms of this letter agreement, and, in particular, its financial terms, are private and confidential. Neither party hereto shall divulge the terms of this letter of intent to any other persons in any manner, except each party may so inform its attorneys, accountants and financial consultants as reasonably necessary for the performance of its obligations hereunder and under the Promotion Agreement, who, however, shall be instructed not to divulge its terms to any other persons except and unless as they may be finally required by law or court process. In the event of a breach of the foregoing, the damaged party may seek recovery of all damages as allowed by law, including, without limitation, injunctive relief.

13. <u>Exclusivity</u>. Each of the parties agrees that for a period of ninety (90) days after the date this letter is fully executed by the parties hereto and for a period of [sic], AMA Pro Racing and JamSports shall negotiate exclusively and in good faith with one another, and neither party shall enter into any discussion or negotiations with any third party with respect to the subject matter hereof. If a party hereto shall receive any offer from a third party with respect to the subject matter hereof, the receiving party shall promptly notify the other party hereto of the offer, the name of the offeror and the terms thereof. The parties shall use their best efforts, negotiating in good faith, to enter into the Promotion Agreement within thirty (30) days from the date this letter is fully executed by the parties hereto.

14. <u>Final Contract</u>. Except for the obligations set forth in Sections 12, 13 and 16, this letter of intent is not binding in any way upon the parties hereto. This letter of intent is expressly conditioned upon the parties entering into the Promotion Agreement. JamSports' counsel shall prepare and submit to AMA Pro Racing, and its counsel a draft of the Promotion Agreement as soon as is reasonably possible after the date upon which this letter of intent is fully executed by the parties hereto.

15. <u>Closing</u>. The transaction contemplated hereby shall close no later than ninety (90) days from the date this letter is fully executed by the parties hereto and at such time and place as the parties hereto shall agree upon, subject to the satisfaction or waiver of any conditions precedent to closing which are agreed upon by the parties.

16. <u>Publicity</u>. Neither party hereto shall issue any press releases or other announcements regarding this letter of intent or the transaction contemplated hereby unless such release or announcement first shall be approved by the other party or shall be required by law.

2d Am. Compl., Ex. A.

Three days after signing the letter of intent, AMA Pro sent a letter to facilities managers advising them that AMA Pro "has entered into an agreement with JamSports, a division of

Chicago-based Jam Productions, for the exclusive promotion of AMA Supercross events for the 2003-2009 seasons." 2d Am. Compl., Ex. B. The letter "authorize[d] JamSports and/or Jam Productions to negotiate with your facility, on an exclusive basis, regarding the organization and production of future AMA Supercross events." *Id.* The following day, AMA Pro announced on its website that it had "selected JamSports and Entertainment as its new promoter partner for the AMA U.S. Supercross Championship Series commencing with the 2003 seasons and extending through the 2009 season." 2d Am. Compl., Ex. C. The website further explained that "[t]he decision was made by the Board of Directors of AMA Pro Racing after evaluating proposals from several companies, including Clear Channel Entertainment, the current promoter of AMA Supercross events." *Id.* On November 21, 2001, AMA Pro's attorney, Kevin Shoemaker, sent JamSports' attorney, Vicki Baue, a draft of the sanctioning agreement, accompanied by a letter stating he had provided "a copy of this agreement to Tim Owens, counsel for the American Motorcyclist Association ("AMA")," stating that "the final agreement is subject to approval by Tim and the AMA." Defs.' Ex. Jam 23. Owens and AMA Pro CEO Scott Hollingsworth were "cc'd" on the letter.

In late December 2001, AMA Pro's website announced that the 2003 AMA supercross series would include events in New York, Los Angeles, Atlanta, Dallas, Houston, Phoenix, Indianapolis, Las Vegas, Washington, D.C., San Francisco, Boston, New Orleans, Charlotte, Tampa and Daytona. 2d Am. Compl., Ex. F. In the online press release, Hollingsworth was quoted as saying:

> I am delighted with the new relationship with JamSports. The next era of growth of AMA Supercross is dependent upon live television and nationwide markets. We were excited to announce this month a live television package with Speed

5

Channel, and now we have markets in place that will ensure AMA Supercross is
seen by fans coast-to-coast.

*Id.* John Farris, AMA Pro Racing's vice president of commercial development, stated:

The announcement of these markets comes as a result of extensive conversations
with our participants, our television partners who help us promote the series and
its stars, and current and prospective sponsors of both the Championship and the
teams. . . . In 2003, we will deliver a superior marketing platform that will take
AMA Supercross across the country into a great list of major markets.

*Id.*

Clear Channel, however, did not abandon its effort to keep the supercross series.

According to the minutes from the November 12, 2001, meeting of the AMA Pro Board of

Directors, Clear Channel had sent letters to all the Board members "just prior to the meeting"

indicating it wanted to continue negotiations for the AMA contract. Pl.'s Ex. S at 2. "Mr.

Hollingsworth reminded the Board that further negotiations with CCE were prohibited by the

terms of a letter of intent between AMA Pro and JamSports. Those terms required the AMA not

to talk with any other parties on this subject until either an agreement had been reached or a 90-

day confidentiality period had elapsed." *Id.* But a week later, Clear Channel sent a proposal to

P.J. Harvey, a member of AMA Pro's Board, accompanied by a letter, which stated in part:

On November 9, 2001, we sent a letter to you expressing our interest in
continuing negotiations with the AMA concerning a long-term agreement,
provided that the AMA is still in a position to do so. As of this date, we have not
received any response from the AMA, and we are uncertain as to whether the lack
of response indicates an unwillingness to continue our negotiations.
In our last communication with you, we indicated Clear Channel
Entertainment – Motor Sports division's willingness to pay the increased financial
consideration that you last requested on behalf of the AMA. In order to further
clarify our position, I have revised the Proposal that was provided to you on
October 5, 2001 to indicate the terms that Clear Channel is willing to accept. The
revised Proposal incorporates all of the language changes requested by you along
with confirmation of the requested increase in financial consideration. The

Proposal, which has been signed by me on behalf of Clear Channel Entertainment
-- Motor Sports' division, is enclosed herein for your review.

You should understand that we are only submitting this Proposal to you if
the AMA is in a position to consider it. If not, please disregard the Proposal.
While we are hopeful that there remains a window of opportunity for us to attempt
to reach an agreement with the AMA we do not want to interfere with any binding
agreement that the AMA may have reached with Jam or any third parties. Thus
our Proposal is contingent upon AMA being free of contractual obligations that
would restrict its ability to deal with Clear Channel at this point.

AMA-CCE Ex. 30. The letter also indicated that Clear Channel intended to produce a supercross

series with or without AMA's sanctioning. The parties dispute whether Clear Channel knew at

the time about the exclusivity clause of AMA Pro and JamSports' letter of intent.

When AMA Pro and JamSports failed to reach an agreement within the 90 day deadline

set by the letter of intent, AMA Pro sent JamSports a letter extending the deadline to 12 a.m.

February 6, 2002 and stating that "[w]e look forward to continuing the good faith efforts both

parties have shown in attempting to conclude the agreement contemplated under the Letter of

Intent." 2d Am. Compl., Ex. G. On February 5, 2002, the AMA Pro Board of Directors met

several times to discuss the proposed promotion agreement with JamSports. According to the

minutes of the meeting, when the board convened for the first time that day, two board members

– Harvey and Rick Gray – expressed their dissatisfaction with JamSports' insistence that the

promotion agreement include a provision making its $3 million up-front payment to AMA Pro

refundable even though the letter of intent described the $3 million payment as non-refundable.

Defs.' Ex. Jam 55. Harvey and Gray said "they could not consider approval of the agreement as

long as such language was included." *Id.* Another board member discussed that Clear Channel

had obtained sanctioning of a supercross series from the Federation Internationale de

Motocyclisme ("FIM") and Dorna, the firm that promotes FIM-sanctioned races. *Id.* The

members then voted on accepting the revised language to the JamSports' agreement, but the motion was defeated 3 to 2. *Id.* "The remaining Board members directed Mr. Hollingsworth to go back to the negotiating table with JamSports and propose a deal based on the Letter of Intent that would include no refundability provision." *Id.* The meeting then adjourned.

After the meeting adjourned, Hollingsworth spoke with JamSports. As a result of that conversation, JamSports sent Hollingsworth a letter dated February 5, stating: "You have informed us of the requirement by your Board that the $3 million advance must be nonrefundable. We agree to a nonrefundable $3 million advance with terms consistent with the Letter of Intent." 2d Am. Compl., Ex. H. On the evening of February 5, the board reconvened. According to the minutes of the executive session of the meeting, one of the directors advised the others

> that the newly formed alliance between Clear Channel [("CCE")], Dorna and the FIM had serious implications on the survivability of a JamSports-promoted AMA Supercross series running in direct competition with a CCE-promoted supercross series. He reminded the Directors that Dorna owns and operates the G.P. Road Race World Championships, which are series of critical importance to the motorcycle factories. He said that the close working relationship between Dorna and the manufacturers in that series could prompt a decision by the manufacturers, at the factory level, to compete in the CCE Supercross series rather than in the AMA/JamSports series. He asked the Directors if, given that possibility, they really wanted to attempt a Supercross series without participation by the OEMs, $3 million cash influx or not. He said that a Supercross series without OEM participation would be disastrous for the AMA and for the sport of motorcycling in general.

Defs.' Ex. Jam 56. The minutes reflect that the "Directors agreed that this was a serious issue warranting further discussion pending receipt of information arising from" a meeting the next day with representatives from Clear Channel, Dorna and the FIM. *Id.*

The meeting went back into regular session, at which time Hollingsworth informed the

board that "he had gotten verbal confirmation from Jerry Mickelson of JamSports to agree to language that was more consistent with the Letter of Intent. This included the removal of all references to a refund of the $3 million up-front payment, as well as elimination of the Revised Marketing Plan and the Termination Clause." Defs.' Ex. Jam 57. The AMA's lawyer, Owens, and AMA Pro's lawyer, Shoemaker, joined the teleconference. After discussing whether AMA wanted to vote on the revised contract before the midnight deadline expired or wait for JamSports to make the changes in writing, the board moved to "call upon JamSports to provide, in writing, specific language that removed the aforementioned provisions and clauses, and that the Board agree to deliver a definite, final decision to JamSports in no more than 7 days." *Id.* When the clock struck midnight on February 6, an agreement between JamSports and AMA Pro had not been signed.

On February 8, JamSports' attorney sent a letter to AMA Pro reiterating JamSports' agreement that its $3 million advance to AMA Pro would be non-refundable and attaching a revised promotion agreement reflecting the change. 2d Am. Compl., Ex. I. But on February 6, AMA Pro had contacted Clear Channel to reopen negotiations, which Clear Channel agreed to do after receiving written assurance from AMA Pro that it was free to negotiate. Clear Channel sent a proposal to AMA Pro on February 14. At the AMA Pro board's February 14 meeting, the acting chairman asked the group to consider Clear Channel's latest proposal. Defs.' Ex. Jam No. 60. The group then debated the merits of the Clear Channel proposal in comparison with JamSports' proposal. *Id.* The board voted to "forward both the CCE and the JamSports proposals to the AMA Board, accompanied by a study of the pros and cons of both, with a recommendation by AMA Pro to ratify the JamSports proposal." *Id.*

After the AMA Board met on February 16, it directed AMA Pro to enter into an agreement with Clear Channel. On April 12, 2002, AMA Pro announced on its website that it had signed a promotion agreement with Clear Channel for the 2003-2009 seasons. 2d Am. Compl., Ex. J. JamSports alleges that Clear Channel wrested the AMA Pro contract away from it by: requiring venues hosting Clear Channel supercross races to agree not to book other motor sports events within 60 to 90 days of a Clear Channel event; offering original equipment manufacturers ("OEMs") and supercross star athletes financial incentives for participating in Clear Channel's series; and seeking endorsement from an alternative sanctioning body (FIM) that could limit the AMA's sanctioning activities.

## Analysis

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court evaluates admissible evidence in the record in the light most favorable to the nonmoving party. *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). The Court's "function is not to weigh the evidence but merely to determine if 'there is a genuine issue for trial.'" *Id.* (citation omitted). "The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Tr. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citation omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d

10

391, 395 (7th Cir. 1997) (citations and internal quotation marks omitted). However, "in complex antitrust cases, summary judgment should be used sparingly, unless the record is clear that the antitrust claims cannot succeed. If the claims cannot succeed, then judicial administration is served better by disposition prior to trial." *Wigod v. Chicago Mercantile Exchange*, 981 F.2d 1510, 1514-15 (7th Cir. 1992) (citations omitted).

### Antitrust Claims

Clear Channel raises two general arguments for why JamSports cannot succeed on its antitrust claims. First, it argues that JamSports' cannot show that Clear Channel's allegedly anticompetitive behavior has caused the type of injury that the Clayton and Sherman Acts were intended to combat. Second, Clear Channel argues the claims based on the essential facilities doctrine (all the remaining antitrust claims except Count 15) must fail because the stadiums to which JamSports' access was blocked were not essential facilities. Clear Channel also argues it is entitled to summary judgment on Count 15 because JamSports cannot show that Clear Channel's conduct was anticompetitive. We will review each of Clear Channel's arguments in turn.

*1.* *Antitrust Injury*

Section 4 of the Clayton Act creates a right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. The Supreme Court has interpreted this to mean that for a private plaintiff to have a right of action under § 4, the "plaintiff must prove the existence of '*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334

(1990) (emphasis in original; quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). In other words, it is not enough for a plaintiff to show injury in fact; the plaintiff must show injury that "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp.*, 429 U.S. at 489. The purpose of the antitrust injury requirement is to ensure that "the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief." *Atlantic Richfield Co.*, 495 U.S. at 342. The antitrust injury requirement can be understood as an element of a private plaintiff's standing to sue under § 4 of the Clayton Act. *Midwest Gas Services, Inc. v. Indiana Gas Co.*, 317 F.3d 703, 710 (7th Cir. 2003) (citing *Brunswick Corp.*, 429 U.S. at 489). *See also, e.g.*, *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998) ("[A] showing of antitrust injury is a necessary but insufficient condition of antitrust standing.").

The Seventh Circuit has "stress[ed] that antitrust [law] is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business." *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996) (citations omitted). Clear Channel reads this to mean that to show antitrust injury, the plaintiff must show harm to consumers in the form of decreased output or increased prices. Several Seventh Circuit decisions authored by Judge Easterbrook adopt this definition of antitrust injury. Writing for the court, Judge Easterbrook has explained that "[t]he antitrust injury doctrine of *Atlantic Richfield Co.* . . . ; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986); and *Brunswick Corp.* . . . , requires every plaintiff to show that its loss comes from acts

12

that reduce output or raise prices to consumers." *Chicago Professional Sports Ltd. Partnership v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) (citations omitted). *See also U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626-27 (7th Cir. 2003); *Stamatakis Industries, Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992); *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986). Judge Easterbrook's consistent statements that antitrust injury is limited to decreased output and increased prices finds support in the Supreme Court's understanding of why Congress created a private right of action in antitrust cases. The Court has explained that the legislative history of the language currently codified as § 4 of the Clayton Act "shows that Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices by the giant trusts and combinations that dominated certain interstate markets." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 530 (1983) (footnote omitted).

Clear Channel argues that JamSports cannot show that reduced output or increased prices resulted from Clear Channel's conduct because the number of promoters of the AMA-sanctioned supercross series has remained unchanged. Clear Channel reasons as follows: JamSports claims Clear Channel kept it out of the market for promoting the AMA-sanctioned supercross series; because there is only one promoter of the AMA-sanctioned series, JamSports was attempting to replace Clear Channel as the sole promoter of the series; because there would be only one promoter of that series whether Clear Channel or JamSports won the AMA Pro contract, the award of the contract had no effect on output or prices. Clear Channel contends that as a matter of law, no antitrust injury can be found when one monopolist prevents another firm from

13

replacing it as the monopolist.

This legal theory has support in the Seventh Circuit's cases. The Seventh Circuit has stated that conduct that "merely shifts a lawful monopoly into different hands . . . has no antitrust significance, although it hurts the lawful owner of the monopoly power." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984). In *Riegel Textile Corp.*, the plaintiff claimed that the defendant had violated § 2 of the Sherman Act by fraudulently patenting the antistatic yarn that the plaintiff had invented and reaping the benefits of the patent-created monopoly to which the plaintiff thought it was entitled. Judge Posner said the court could not find the "consumer interest" in the case because consumers would not care who held the patent and thereby became a monopolist in the antistatic yarn market. The court concluded that "[i]f no consumer interest can be discerned even remotely in a suit brought by a competitor – if, as here, a victory for the competitor can confer no benefit, certain or probable, present or future, on consumers – a court is entitled to question whether a violation of antitrust law is being charged." *Id.* at 266-67 (citing Frank Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 33-39 (1984)). *See also West Penn Power Co.*, 147 F.3d at 269 (merger of electric companies did not cause antitrust injury because regulation had prevented competition in the market for electricity prior to the merger).

But a case decided by the Seventh Circuit two years after *Riegel Textile Corp.* expressly rejects the legal theory on which Clear Channel's argument is based. In *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986), the Seventh Circuit was asked to determine whether anticompetitive conduct in the vying for a natural monopoly could cause antitrust injury. *Fishman* involved the sale of the Chicago Bulls basketball franchise. The owner of the Bulls

14

agreed to sell the team to the plaintiffs, but the NBA Board of Governors scuttled the deal when a competing bidder, who owned the Chicago Stadium, said that the Bulls could not play in the Stadium if sold to the plaintiffs. As a result, the defendants were able to buy the Bulls. After a bench trial, the judge concluded that the defendants had violated §§ 1 and 2 of the Sherman Act. On appeal, the defendants argued that the competition between the parties "to acquire a natural monopoly was not protected by the antitrust laws because substitution of one competitor for another would not injure competition." *Id.* at 532. The court rejected this view. Relying on *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), the court said "use of monopoly power to preclude [competition to acquire a natural monopoly] violated the Sherman Act." *Fishman*, 807 F.2d at 533. The court similarly rejected the defendants' claim that "even if some natural monopoly cases are within the purview of the Sherman Act, this one is not because the plaintiffs have failed to articulate just how the ultimate consumers – Chicago fans – will be hurt by this violation." *Id.* at 535. The court explained:

> We have found no cases (and none has been cited to us) in which the Supreme Court has put the burden on a plaintiff to isolate and demonstrate the consumer impact of a particular purported antitrust violation not directed at the consumer level. While antitrust law may be moving in the direction of being construed as a "pure" consumer protection measure, cases such as *Otter Tail* strongly suggest that in the natural monopoly area, at least, the Supreme Court has not embraced this approach. The Court has instead stressed that the antitrust laws seek to protect competition, as well as to protect those activities that will promote competition. The antitrust laws are concerned with the competitive *process*, and their application does not depend in each particular case upon the ultimate demonstrable consumer effect. A healthy and unimpaired competitive process is presumed to be in the consumer interest.

*Id.* at 536 (citations and footnotes omitted; emphasis in original). The court further stated that "the Court has never given us to believe that anything save unfettered competition is the key to

consumer well-being" and that "[p]art of the problem with requiring the plaintiff to pinpoint just how the public is harmed by a short-circuited competitive process is that the plaintiff has never been given an opportunity to compete freely and win the monopoly." *Id.* at 537-38 (citation omitted). The court distinguished *Riegel Textile Corp.* on the ground that "[t]here would never have been competition between Brunswick or Riegel, with or without Riegel's misconduct" so the competitive process was never jeopardized. *Id.* at 538. In conclusion, the court stated that "[t]he fact that the precise impact of defendants' conduct on the broad consuming public has remained unfocused here does not prevent a finding that the antitrust laws have been violated." *Id.*

Judge Easterbrook dissented in *Fishman*, explaining that the defendant's "choice of tactics had no effect on consumers. Antitrust law condemns *results* harmful to consumers; it condemns bad means to the extent they have a tendency to bad results. Bad means that injure only business rivals – that is to say, business torts – are outside the scope of antitrust law." *Fishman*, 807 F.2d at 564 (Easterbrook, J., dissenting in part) (emphasis in original). Clear Channel argues that the portion of *Fishman* discussed above is no longer good law because Judge Easterbrook's dissent in *Fishman* has been cited by the majority in subsequent cases. For example, in *Flip Side Productions, Inc. v. Jam Productions, Inc.*, 848 F.2d 1024 (7th Cir. 1988), the court quoted Judge Easterbrook's statement that "'injury to the consumers is therefore an essential ingredient of liability'" under §§ 1 and 2 of the Sherman Act. *Id.* at 1032 (quoting *Fishman*, 807 F.2d at 568 (Easterbrook, J., dissenting in part)). And, as discussed above, Judge Easterbrook's position that antitrust injury is defined by decreased output or increased prices has certainly prevailed in the Seventh Circuit's more recent decisions discussing antitrust injury. But

the Seventh Circuit has never explicitly overruled *Fishman*, and we are reticent to find that it has

done so *sub silento*. As Judge Flaum has noted:

> Whether harm to consumers is the *sine qua non* of antitrust injury is an issue over
> which there is currently a split in this circuit. Some of our cases hold that a
> plaintiff, to satisfy the antitrust injury requirement, must demonstrate that the
> challenged practice causing him harm also harms consumers by reducing output
> or raising prices. *Stamatakis Indus., Inc.*, 965 F.2d [at 471]; *Chicago Professional
> Sports Ltd. Partnership*, 961 F.2d [at 670]. Others hold that application of the
> antitrust laws "does not depend in each particular case upon the ultimate
> demonstrable consumer effect." *Fishman*, 807 F.2d [at 536]; *see also Chicago
> Professional Sports*, 961 F.2d at 677 (Cudahy, J., concurring).

*Banks v. NCAA*, 977 F.2d 1081, 1097 (7th Cir. 1992) (Flaum, J., concurring in part and dissenting

in part). Ultimately, however, we need not determine whether the Seventh Circuit would follow

*Fishman* today or otherwise try to reconcile *Fishman* with the court's more recent cases, because

a jury could find Clear Channel's conduct resulted in antitrust injury even under the narrower

definition urged by Clear Channel.

If Clear Channel were correct that JamSports claims only that it was prevented from

replacing Clear Channel as the monopolist in the relevant market, then whether JamSports could

survive summary judgment would depend on whether *Fishman* was still good law. But that is an

unfairly crabbed characterization of JamSports' theory of the case. Though it is true that

JamSports did not continue to promote its supercross schedule after it lost the AMA's

endorsement, it is inaccurate to say that JamSports was trying to enter only the business of

promoting the AMA-sanctioned supercross series. Rather, JamSports contends that it saw the

AMA contract as a way of entering the wider market for promoting supercross events; it "was

credibility, an established portal." Tr. of Oral Argument (Aug. 9, 2004) at 35. Though

JamSports certainly would have liked for Clear Channel to stop promoting supercross entirely if

JamSports won the AMA contract, a jury could find that Clear Channel would have promoted a supercross series to compete with JamSports' AMA-sanctioned series.[2] More pointedly, a reasonable jury could find that had Clear Channel not prevented JamSports from promoting the AMA-sanctioned supercross series, both firms would have promoted competing series, resulting in increased output and, potentially, decreased ticket prices. Accordingly, Clear Channel's conduct reasonably could be found to have harmed the competitive process (the *Fishman* definition of antitrust injury) and decreased output or increased prices (Clear Channel's proposed definition of antitrust injury). Clear Channel has thus failed to show that JamSports cannot prove antitrust injury.

2.  *Essential Facilities*

Counts 5, 6 and 12 of the Second Amended Complaint are based on the essential facilities doctrine. The Seventh Circuit has explained that

> [t]he so-called "essential facilities doctrine" imposes upon a firm controlling an essential facility – that is, a facility that cannot reasonably be duplicated and to which access is necessary if one wishes to compete – the obligation to make that facility available to competitors on nondiscriminatory terms. A refusal to deal in the context of an essential facility violates section 2 because control of an essential facility can "extend monopoly power from one stage of production to another, and from one market into another."

*Fishman*, 807 F.2d at 539 (citing *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983)). "[T]o establish liability under the essential facilities doctrine," the plaintiff must show: "(1) control of the essential facility by a monopolist;

---

[2] Clear Channel contends that JamSports' expert witness has conceded that only one entity could survive promoting supercross. But what the expert actually said was that eventually a competitive market would resolve itself into a single series. This is not the same thing as saying competition could never occur. Even if the market were able to sustain competition for one year, that would benefit consumers by increased output during that year.

(2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the

denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility."

*MCI Communications Corp.*, 708 F.2d at 1132-33 (citations omitted). Clear Channel argues that

JamSports cannot satisfy any of the four elements necessary to establish an essential facilities

case. Because the Court agrees with Clear Channel that JamSports has failed to show it was

denied access to "essential" facilities, the Court need not inquire whether it can satisfy the

remaining three elements.

JamSports contends that Clear Channel denied it access to eleven venues: Edison Field

(Anaheim), Rice-Eccles Stadium (Salt Lake City), the Metrodome (Minneapolis), Bank One

Ballpark (Phoenix); America's Center/Edward Jones Dome (St. Louis), Qualcomm Stadium (San

Diego), Sam Boyd Stadium (Las Vegas), the Georgia Dome (Atlanta), Texas Stadium (Dallas),

the Pontiac Silverdome (Detroit), and Reliant Stadium (Houston). JamSports and its expert

witness, economist Robert Baade, argue these facilities taken together were essential to

promoting supercross. They contend that these facilities were preferred by Clear Channel, AMA

Pro and the OEMs that send teams to compete in supercross events because they are in

communities with a proven fan base for supercross and are unlikely to be affected by inclement

weather during the January through May supercross season. JamSports admits that no one

facility is essential but argues that a combination of the above stadiums is essential to a profitable

supercross series.

Clear Channel argues that even if it denied JamSports access to these stadiums,

JamSports cannot prevail because these facilities are not essential to promoting supercross. Clear

Channel challenges both the factual and legal assumptions on which JamSports and Baade's

essential facilities arguments are based. As a factual matter, Clear Channel argues that the eleven facilities named by JamSports are not essential because they have substitutes. Both parties agree that the United States has at least 130 stadiums, not including speedways, that have a capacity of at least 35,000 spectators. The parties further agree that supercross events have been held in forty-three different venues in thirty-eight cities and thirty-two distinct metropolitan areas: Edison Field (Anaheim), the Georgia Dome (Atlanta), Turner Field (Atlanta), Rich Stadium (Buffalo), Memorial Stadium (Charlotte), Charlotte Motor Speedway (Charlotte), Browns Stadium (Cleveland), the Cotton Bowl (Dallas), Texas Stadium (Dallas), Daytona International Speedway (Daytona), Invesco Field (Denver), the Pontiac Silverdome (Detroit), Foxborough Stadium (Foxborough, Massachusetts), the Astrodome (Houston), Reliant Stadium (Houston), the RCA Dome (Indianapolis), Route 66 Motor Speedway (Joliet), Arrowhead Stadium (Kansas City), Sam Boyd Stadium (Las Vegas), Los Angeles Memorial Coliseum (Los Angeles), the Orange Bowl (Miami), Pro Player Stadium (Miami), the Metrodome (Minneapolis), Superdome (New Orleans), Giants Stadium (East Rutherford, New Jersey), Network Associates Coliseum (Oakland), the Oklahoma City Fairgrounds (Oklahoma City), the Citrus Bowl (Orlando), the Rose Bowl (Pasadena), JFK Memorial Stadium (Philadelphia), Bank One Ballpark (Phoenix), Pac Bell Park (San Francisco), Sun Devil Stadium (Tempe), Three Rivers Stadium (Pittsburgh), Sacramento Stadium (Sacramento), Rice-Eccles Stadium (Salt Lake City), Qualcomm Stadium (San Diego), Spartan Stadium (San Jose), the Kingdome (Seattle), the Edward Jones Dome (St. Louis), the Suncoast Dome (St. Petersburg), Alabama International Speedway (Talladega), and RFK Stadium (Washington, D.C.).

By our count, five of the metropolitan areas – Anaheim/Los Angeles, Atlanta, Dallas,

Houston and Phoenix/Tempe – with venues from which JamSports claims to have been excluded had alternative venues where supercross races had been held. And even taking into account the problems inclement weather could pose to a series held during the winter, there are at least sixteen facilities[3] to which JamSports was not denied access that have hosted supercross races in the past and are either in warm-weather states or have domes. The Court also counts five stadiums[4] in cold-weather cities that have been used before and could be used during the last month of the supercross season when the weather has improved, even if the major league baseball season has started, because they do not house major league baseball teams. Furthermore, JamSports' expert Baade points out that there are seventeen domed stadiums[5] in the United States with seating capacity in excess of 35,000 – and JamSports claims Clear Channel denied it access only to seven of them.

With so many venues that have been used for supercross events in the past, are located in communities with strong fan bases, and/or are relatively unaffected by weather, JamSports

---

[3] Turner Field (Atlanta), Memorial Stadium (Charlotte), the Cotton Bowl (Dallas), the Astrodome (Houston), the RCA Dome (Indianapolis), Los Angeles Memorial Coliseum, the Orange Bowl (Miami), Pro Player Stadium (Miami), the Superdome (New Orleans), Network Associates Coliseum (Oakland), the Citrus Bowl (Orlando), the Rose Bowl (Pasadena), Pac Bell Park (San Francisco), Sun Devil Stadium (Tempe), Spartan Stadium (San Jose) and the Suncoast Dome (St. Petersburg). The Court is not counting speedways or stadiums that are no longer in operation.

[4] Rich Stadium (Buffalo), Browns Stadium (Cleveland), Invesco Field (Denver), Arrowhead Stadium (Kansas City), and RFK Stadium (Washington, D.C.).

[5] The Astrodome (Houston), Texas Stadium (Dallas), the Superdome (New Orleans), the Silverdome (Detroit), the Carrier Dome (Syracuse), the Metrodome (Minneapolis), the RCA Dome (Indianapolis), Tropicana Field (St. Petersburg), the Georgia Dome (Atlanta), the Alamodome (San Antonio), Edward Jones Stadium (St. Louis), Bank One BallPark (Phoenix), Safeco Field (Seattle), Minute Maid Park (Houston), Miller Park (Milwaukee), Ford Field (Detroit) and Reliant Stadium (Houston).

cannot show that it was denied access to facilities "essential" to its ability to put on a supercross series. JamSports' claim that it was denied access to essential facilities is further belied by the fact that as of January 24, 2002, it believed it had secured access for the 2003 season to the Georgia Dome (Atlanta), CMGI Field (Foxboro), Ericsson Stadium (Charlotte), the Cotton Bowl (Dallas), the RCA Dome (Indianapolis), Dodger Stadium (Los Angeles), Adelphia Coliseum (Nashville), Giants Stadium (East Rutherford), Network Associates Coliseum (Oakland), Sun Devil Stadium (Phoenix/Tempe), Safeco Field (Seattle), Raymond James Stadium (Tampa), and either FedEx Field or RFK Stadium (Washington, D.C.).

JamSports and Baade contend that the availability of substitutes does not necessarily defeat its essential facilities claim, because the facilities from which JamSports was allegedly barred were preferable to the facilities that were available to it. Clear Channel argues that JamSports and Baade's arguments are based on a misapprehension of the relevant law. The Court agrees. Accordingly to JamSports and Baade, the facilities to which Clear Channel denied JamSports access must be essential because Clear Channel has chosen repeatedly to hold its supercross series in them. This contention assumes that "essential" means "best," "most profitable" or "preferable." But that is not what essential means for purposes of antitrust law. Essential means essential; it does not mean "the most economical." *Midwest Gas Services, Inc.*, 317 F.3d at 714 (citing *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000)). Nor does it mean "best" or "preferable." A facility is not essential even if it is widely preferred by consumers and producers in the market, as long as there is an alternative (albeit inferior) venue. In *Flip Side Productions v. Jam Productions, Ltd.*, Flip Side sued Jam (a related entity of JamSports) and Tempo, another promotion company, claiming they had excluded other concert

promoters from producing shows at the facility then known as the Rosemont Horizon. Flip Side argued that even though it had access to the older International Amphitheatre and two newer venues, the Horizon was essential to the promotion of arena-level concerts in the Chicago area, because artists preferred to perform there and "the International Amphitheatre was more expensive and not suited for staging concerts in light of the fact that the 'Amphitheatre was considered a "toilet" by JAM itself.'" *Flip Side Productions*, 843 F.2d at 1033. The Seventh Circuit rejected this claim, reasoning that even if artists preferred to perform at the Horizon, at different times Flip Side had access to four other venues where concerts were held: the Ampitheatre, Pavilion, Chicago Stadium and Poplar Creek. *Id.* at 1034. Under the Seventh Circuit's reasoning in *Flip Side*, even if JamSports was denied access to the most desirable facilities, that is not enough to make out an essential facilities claim. Accordingly, the Court grants Clear Channel summary judgment on Counts 5, 6 and 12.[6] Because the Court previously dismissed Counts 7-11 and 13-14, of the antitrust claims, only Count 15 remains.[7]

### 3.   *Monopolization*

In Count 15 of the Second Amended Complaint, JamSports alleges that Clear Channel monopolized the market for supercross promotion in violation of § 2 of the Sherman Act by pressuring venues not to book JamSports' races, offering incentives to OEMs and athletes to participate in Clear Channel's series, seeking sanctioning from the FIM, and attempting to derail

---

[6] Because we do not rely on the affidavits of venue managers submitted by Clear Channel, JamSports' Motion to Strike Portions of Venue Affidavits is dismissed as moot.

[7] JamSports voluntarily dismissed Count 16. *See* JamSports' Consolidated Discovery Mot. (docket # 73) at n.15 ("JamSports has advised Clear Channel that it will not proceed with its alternative product market allegation of specialized motor sports.").

JamSports' deal with the Speed Channel, a cable television network. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *MCI Communications Corp.*, 708 F.2d at 1106 (citing *United States v. Grinnell*, 384 U.S. 563, 570-71 (1966)). Clear Channel argues it is entitled to summary judgment on Count 15 because JamSports has failed to raise a genuine issue of fact that a relevant market exists and cannot show that Clear Channel's conduct was anticompetitive. We will discuss each contention separately.

   *a.    Relevant Market*

As the Court stated when confronted with Clear Channel's motion to dismiss JamSports' amended complaint, determining whether a relevant market exists "involves a deeply fact-intensive inquiry." *JamSports*, 2003 WL 1873563, at *6 (citations omitted). "The boundaries of a market or submarket are determined 'by examining such practical indicia as industry or public recognition of the submarket [or market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *Id.* at *5 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Clear Channel argues that JamSports has failed to raise a genuine issue of fact that a relevant market exists, because its only evidence of the market's existence is the report of an expert witness whose testimony should be excluded.

Clear Channel has grossly understated JamSports' evidentiary support for its claim that a national market for the promotion of supercross exists. JamSports filed a motion seeking partial

24

summary judgment on the issue of whether a relevant market existed. Although we deny JamSports motion as procedurally improper, *see infra* at 33, and therefore pass no judgment on the merits of its arguments, we do recognize that it was chock full of facts in support of JamSports' position. But in any event, the Court rejects Clear Channel's argument that we should exclude the expert report and testimony of JamSports' expert witness Dr. Robert Baade, an economist who specializes in the economics of sports, on the relevant market issue. Baade arrived at the conclusion that a distinct market for supercross exists by comparing characteristics of supercross, such as ticket price, attendance, venue size, average revenue and elements of the competition, to those of related motor sports. He found that supercross had more than double the average attendance of motocross, which involves off-road motorcycle racing on natural terrain, and four times the average attendance of arenacross, which like supercross involves racing on indoor tracks with man-made obstacles but is held in significantly smaller venues with lesser known, regional competitors. Although he found that ticket prices for supercross and motocross were similar (but more than $10 higher than tickets for arenacross), the average revenue from supercross ticket sales was more that double what it was for motocross (and more than seven times what it was for arenacross). Baade also analyzed whether producers, riders, OEMs, track designers and builders, and sanctioning bodies regarded supercross as distinct from related motor sports, concluding that they did.

Clear Channel has moved to exclude Baade's testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court held that "reliability is the touchstone for expert testimony based on 'scientific, technical, or other specialized knowledge.'" *Elliott v. CFTC*, 202 F.3d 926, 933 (7th

Cir. 2000) (quoting Fed. R. Evid. 702). The court must act as a gatekeeper to ensure that scientific testimony is "supported by appropriate validation – i.e., good grounds, based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 590; internal quotation marks omitted). The Supreme Court has "extended this gatekeeping function to all expert testimony." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). "The focus, of course, must be solely on the principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. And adversary testing rather than exclusion may be the proper response to allegedly questionable testimony: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

Clear Channel does not question Baade's qualifications. Rather, Clear Channel primarily questions Baade's methodology and conclusions relating to JamSports' essential facilities claims. Because the Court has rejected JamSports' essential facilities claims on other grounds, most of Clear Channel's motion to exclude is moot. But Clear Channel also argues -- albeit only briefly – that Baade's conclusion that supercross constitutes a relevant market has not been reliably derived. Clear Channel contends Baade's analysis was not scientific enough because he did not conduct a study of the cross-elasticities of demand for various motor sports. In so arguing, Clear Channel attempts to belittle Baade's analysis with gratuitous comments such as, "[o]ne important feature of his analysis was to count the number of wheels on motorcycles and cars," and disregards his explanation for not performing a study of cross-elasticities. Clear Channel's Mot. to Exclude at 19. First of all, though studies based on cross-elasticities of demand are certainly helpful in identifying a relevant market, *United States v. E.I. DuPont de Nemours & Co.*, 351

U.S. 377, 393 (1956), they are not essential to demonstrating the existence of a relevant market. *Nobody in Particular Presents, Inc. v. Clear Channel Communications*, 311 F. Supp. 2d 1048, 1082 (D. Colo. 2004) (listing cases). Furthermore, Clear Channel's potshots do not raise a serious challenge to Baade's methodology, which involved analyzing characteristics of motor sports other than the number of wheels on the vehicles. Cross-examination, not exclusion, is the appropriate vehicle for advancing the sort of incredulity that Clear Channel urges. A genuine issue of fact exists regarding the parameters of the relevant market.

    *b.*    *Anticompetitive conduct*

    The Supreme Court has characterized the second element of a § 2 claim as "the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482-83 (1992) (citing *United States v. Griffith*, 334 U.S. 100, 107 (1948)). As with the antitrust injury requirement, the parties disagree on the law relevant to determining whether Clear Channel engaged in such behavior. Clear Channel argues that the intent of its principals to "lock up" the stadiums Clear Channel uses for supercross and their desire for JamSports to be regarded as "poison," *see* Ex. CCE 1106, are irrelevant to proving a § 2 claim. In support, Clear Channel relies primarily on *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401-02 (7th Cir. 1989), in which the court stated:

> Firms "intend" to do all the business they can, to crush their rivals if they can. Intent to harm without more offers too vague a standard in a world where executives may think no further than "Let's get more business." Rivalry is harsh, and consumers gain the most when firms slash costs to the bone and pare price down to cost, all in pursuit of more business. Few firms cut price unaware of what they are doing; price reductions are carried out in pursuit of sales, at others' expernse. Entrepreneurs who work hardest to cut their prices will do the most

27

> damage to their rivals, and they will see good in it. You cannot be a sensible business executive without understanding the link among prices, your firm's success, and other firms' distress. If courts use the vigorous, nasty pursuit of sales as evidence of a forbidden "intent," they run the risk of penalizing the motive forces of competition.

*Id.* Accordingly, the court found intent should not be a basis for liability in *predatory pricing* cases, favoring instead a test that looks at the firm's possibility of recouping its profits from cutting prices. Despite the decision's lengthy discussion of why focusing on intent can mislead the examiner, its rejection of intent evidence was limited to § 2 predatory pricing cases. Because JamSports does not allege Clear Channel engaged in predatory pricing, *A.A. Poultry Farms* is not directly on point.

Clear Channel points out that the Seventh Circuit has said more generally that when it comes to liability under § 2 of the Sherman Act, "if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 379 (7th Cir. 1986) (citing *Ball Memorial Hospital*, 784 F.2d at 1338-39). In *A.A. Poultry Farms*, the court cited *Olympia Equipment Leasing* for the proposition that "liability under § 2 for abuse of monopoly power stems from anti-competitive effects and not intent." *A.A. Poultry Farms*, 881 F.2d at 1402. But Clear Channel is wrong to assume that *Olympia Equipment Leasing* should be read to mean evidence of intent to monopolize is always irrelevant to proving a § 2 claim. The Supreme Court has unambiguously stated that intent to monopolize is "relevant to the question of whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive' – to use the words in the trial court's instructions – or 'predatory,' to use a word that scholars seem to favor." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985). And citing *Aspen*

*Skiing*, the Seventh Circuit, subsequent to *Olympia Equipment Leasing* and *A.A. Poultry Farms*,

has recognized that "'[i]ntent *is* relevant to the offense of monopolization." *State of Illinois v.*

*Panhandle Eastern Pipeline Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991) (emphasis in original;

citing *Aspen Skiing Co.*, 472 U.S. at 602). The *Panhandle* court seemingly reconciled *Olympia*

*Equipment Leasing* with *Aspen Skiing*, recognizing the continuing relevance of intent:

> The "intent" to achieve or maintain a monopoly is no more unlawful than the
> possession of a monopoly. Indeed, the goal of any profit-maximizing firm *is* to
> obtain a monopoly by capturing an ever increasing share of the market. Virtually
> all business behavior is designed to enable firms to raise their prices above the
> level that would exist in a perfectly competitive market. Economic rent – the
> profit earned in excess of the return a perfectly competitive market would yield –
> provides the incentive for firms to engage in and assume the risk of business
> activity. Monopolies achieved through superior skill are no less intentional than
> those achieved by anticompetitive means (as Learned Hand observed, "no
> monopolist monopolizes unconscious of what he is doing"), so the intent relevant
> to a § 2 Sherman Act claim is only the intent to maintain or achieve monopoly
> power by *anticompetitive means*. Section 2 forbids not the intentional pursuit of
> monopoly power but the employment of unjustifiable means to gain that power.

*Id.* (emphasis in original; citations omitted).

Clear Channel maintains that its allegedly anticompetitive conduct had a legitimate

business justification. "Conduct that tends to exclude competitors may . . . survive antitrust

scrutiny if the exclusion is the product of a 'normal business purpose,' for the presence of a

legitimate business justification reduces the likelihood that the conduct will produce undesirable

effects on the competitive process." *Id.* at 1481-82 (quoting *Aspen Skiing*, 472 U.S. at 608-10).

But whether the defendant had "valid business reasons" for its conduct is a question of fact. *Id.*

at 1482. And the trier of fact can look to Clear Channel's intent to determine whether its conduct

had a purpose other than excluding competition. As the court explained in *Panhandle Eastern*

*Pipeline*:

When courts consider the "intent" of a firm charged with monopolization, they look not to whether the firm intended to achieve or maintain a monopoly, but to whether the underlying purpose of the firm's conduct was to enable the firm to compete more effectively. Did the firm engage in the challenged conduct for a legitimate business reason? Or was the firm's conduct designed solely to insulate the firm from competitive pressure? Intent is relevant, then, because intent determines "whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" *Aspen Skiing*, 472 U.S. at 602. When courts speak of a firm's intent in a monopolization case, they refer to the legitimacy of the firm's conduct as measured by its intended effect on the competitive process.

*Panhandle Easter Pipeline Co.*, 935 F.2d at 1481. A jury ultimately may find that Clear Channel's conduct had a legitimate business justification, but as we explain, JamSports has raised a genuine issue that Clear Channel engaged in conduct aimed solely at hindering competition.

JamSports has presented evidence that Clear Channel threatened stadiums that it would pull all of its events (including non-supercross events) from the stadiums if they booked JamSports' supercross race.[8] On October 4, 2000, Charlie Mancuso, Clear Channel's president of the motor sports division, e-mailed Eric Cole, vice president of booking motor sports events, stating that Cole needed to quietly "'lock up' our key supercross stadiums for 2002 through at least 2005" to protect Clear Channel in case the AMA began contacting "our stadiums." Ex. CCE 32561. Mancuso instructed Cole to get protection clauses – that is, guarantees that the venues would not host other motor sports events within a certain number of days or months of Clear Channel's events – in all the contracts. *Id.* In an e-mail to Mancuso on November 6, 2001, Cole wrote that he had "made it crystal clear" to the director of America's Center in St. Louis

_____

[8] Although the Court has determined JamSports cannot proceed under the essential facilities doctrine, Clear Channel's alleged methods of preventing venues from hosting JamSports events are relevant to Count 15.

that Clear Channel "intended to produce a SX event as usual in 2003, 2004, 2005 and beyond in St. Louis." Ex. CCE 32070. Cole said that when the director said he would allow JamSports to book a race 45 days before or after Clear Channel's race, Cole "reminded him that another booking could cost him our events because we might consider it too crowded in the marketplace." *Id.* Clear Channel's booking notes for November 12, 2001 also indicate that when the America's Center suggested JamSports had a hold on a date, Clear Channel told the venue that any attempt to book another supercross event "would have serious implications not only for our supercross, but on our January monster truck event as well." Ex. CCE 39014.

JamSports also has presented evidence that Clear Channel took a threatening posture with the Astrodome and Reliant Field. The booking notes for November 20, 2001 and an e-mail to Mancuso state that when told that JamSports was inquiring about dates at the Astrodome and Reliant Park, Cole reminded the venues' general manager that "we have been producing motor sports s events in that facility for 30 years" and that it was "unacceptable" for the facility book a JamSports' race. Exs. 293-94 and 39017. Cole demanded 90 day protection periods for all Clear Channel motor events. *Id.* Cole followed up with a letter to the general manager, stating in relevant part:

> In response to our conversation yesterday, I am writing to inform you that I am deeply troubled by the way it appears our future business is being handled at Reliant Park and the Reliant Astrodome. Your booking practices are creating reasons for us to be very concerned about the future viability and profitability of our events at these facilities. We have been producing our motorsports events in the Astrodome for over thirty years. The investment we have made in these events at your facility is measurable in the tens-of-millions of dollars and far exceeds our investment in any other stadium in the world. Your apparent concern for "missing out on future shows" that some brand new motorsports company alleges to be intending to produce raises considerable doubt as to your commitment to protecting and growing our events – and our investment – in your

stadiums. If you are even considering adding another event to what is already the most prolific stadium motorsports calender on earth, it will cause us to wonder whether the Reliant Astrodome and Reliant Park can remain as sustainable venues for Clear Channel Entertainment's touring motorsports events in future years.

. . .

To my even greater astonishment, you said you hoped to give a hold to another motorsports event on the January 11, 2003 date in question. That is entirely unacceptable. . . .

As I mentioned above, the 45-day "protection period" you typically offer is inadequate, especially in this unique market situation. . . . In the future, we require, at a minimum, 90 days protection for all motorsports events prior to any of our dates, and 60 days afterwards.

Ex. CCE 2713. Cole sought approval from Ken Hudgens, Clear Channel's vice president of marketing for the motor sports division, to send the letter. Hudgens approved the letter, stating: "we need to be scaring people – not the other way around. We have done over 100 shows in this building. Probably 150." Ex. 2557. And in an e-mail to Mancuso on December 19, 2001, Cole said he had "made crystal clear" to a venue that if they allowed JamSports to hold a race that interfered with a Clear Channel Monster Jam, the venue "may be forcing [Clear Channel] to look elsewhere." Ex. CCE 31718. Similarly, on August 13, 2002, Cole wrote "[l]et's see after I threaten to move FMX" in response to a colleague's concerns that a venue would rent to JamSports if Clear Channel did not produce its supercross event at the venue. Ex. CCE 25535.

JamSports has presented evidence that Clear Channel tried to use its other motor sport events and concerts to entice venues to exclude JamSports. For example, Cole sent an e-mail to Mancuso on November 7, 2001, indicating that JamSports would approach Sun Devil Stadium and proposing to try to get an exclusive deal with the stadium for all events, using the fact that Clear Channel's music division was planning a concert there. Ex. CCE 2610. On December 3, 2001, Mancuso wrote an e-mail to Cole suggesting that he promise a venue one or two Monster

32

Jam events in addition to supercross, explaining "[w]e just might have to bite the bullet and do two more events in the market in 2003 than we want to to protect ourselves." Ex. CCE 5397.

JamSports argues it had a legitimate business reason for seeking protection periods. Perhaps so, but that is for a jury to decide. A reasonable jury could conclude that Clear Channel used its market power to pressure stadiums not to host competing events with the sole intent of restraining the competitive process. JamSports argues Clear Channel employed several other tactics to suppress competition in the market, but we need not consider them at this time because the evidence regarding Clear Channel's conduct with venues is sufficient to create a genuine issue of fact.[9] Accordingly, the Court denies Clear Channel's motion for summary judgment as to Count 15.

### 4. *JamSports' motion for partial summary judgment*

JamSports has moved for "partial summary judgment" on its antitrust claims. Its motion seeks findings in its favor on three elements of its claims: the relevant market, Clear Channel's possession of market power, and Clear Channel's possession of monopoly power. The short answer is that this is not an appropriate basis for a motion for summary judgment under Rule 56. "[S]ummary judgment is not contemplated or authorized for any portion of a claim less than the whole." *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 217 (7th Cir. 1946); *see also, e.g., United States ex rel. Ramm Plumbing Co. v. Wil-Freds Construction, Inc.,* No. 96 C 793, 1997 WL 391456, at *4 (N.D. Ill. July 7, 1997); *Arado v. General Fire Extinguisher Corp.,* 626 F. Supp. 506, 508-09 (N.D. Ill. 1985). This case is not controlled by *Wilson v. Sundstrand,* No. 99 C

---

[9] If it wishes to seek an order excluding the other matters at trial, Clear Channel should file a motion *in limine* in connection with preparation of the final pretrial order.

6944, 2003 WL 21961359, at * 4 (N.D. Ill. Aug. 18, 2003), in which this Court permitted

consideration of a summary judgment motion the goal of which was to eliminate certain

affirmative defenses. In the circumstances of that case, the motion was, practically speaking, the

equivalent of one seeking summary judgment on an entire claim. Largely for this reason, there is

authority permitting consideration of such a motion in those circumstances. *See generally*

*Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.,* No. 00 C 5658, 2002

WL 1466806, at *12 (N.D. Ill. July 8, 2002). The same is not true here. JamSports' motion for

partial summary judgment is denied.

*State law claims*

1.      *Breach of contract (Count 1)*

Count 1 is JamSports' claim against AMA Pro for breach of contract. It is based on two

distinct theories of liability: a claim that the November 2001 letter of intent was a binding

contract entitling JamSports to promote AMA Pro's supercross series and that AMA Pro

breached the contract by later contracting with Clear Channel; and a claim that AMA Pro

breached the letter of intent's terms requiring confidentiality and exclusivity. On the former

claim, AMA Pro has moved for summary judgment. On the latter claim, JamSports has moved

for summary judgment on liability; AMA Pro has not moved for summary judgment on liability

but rather seeks summary judgment only as to certain aspects of JamSports' damage claim.

AMA Pro is entitled to summary judgment on JamSports' claim that the letter of intent

was itself a binding promotion agreement. In this regard, the letter of intent could hardly be

clearer: it stated that except for the confidentiality, exclusivity, and publicity provisions, "this

letter of intent is not binding in any way upon the parties hereto" and that it was "expressly

. 34

conditioned upon the parties entering into the Promotion Agreement" that they hoped to

negotiate. 2d Am. Compl., Ex. A, ¶ 14. A letter of intent is unenforceable as a contract when it

specifically contemplates a later agreement as a condition precedent to a binding contract. *See*

*Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 287-88, 565 N.E.2d 990,

993 (1990); *Chicago Investment Corp. v. Dolins,* 107 Ill. 2d 120, 126-27, 481 N.E.2d 712, 715

(1985); *Magnus v. Lutheran General Health Care System,* 235 Ill. App. 3d 173, 181, 601 N.E.2d

907, 913 (1992).

JamSports has moved for summary judgment as to liability on its claim for breach of the

letter of intent's exclusivity and confidentiality provisions. The exclusivity provision required

AMA Pro to negotiate "exclusively and in good faith" with JamSports for 90 days after the letter

was signed; prohibited AMA Pro from entering into any discussion with any third party; and

required AMA Pro and JamSports each to advise the other promptly if it received an offer. 2d

Am. Compl. Ex. A, ¶ 13. The confidentiality provision prohibited both parties from divulging

the letter of intent's terms to anyone other than its attorneys, accountants, and financial

consultants. *Id.,* ¶ 12. As to these provisions, the letter of intent was indisputably a binding

contract between JamSports and AMA Pro. "[T]he parties' intent determines whether a letter of

intent is an enforceable contract," *Quake Construction,* 141 Ill. 2d at 296, 565 N.E.2d at 998, and

in this case, their intent that these terms be enforceable was clearly expressed.

JamSports contends that AMA Pro breached these provisions by failing to advise

JamSports of a proposal AMA Pro received from Clear Channel in early November 2001, and by

failing to negotiate in good faith with JamSports. JamSports' summary judgment motion

addresses both of these contentions. We deal with each in turn.

AMA Pro does not dispute that Clear Channel representatives had a number of communications with members of AMA Pro's board after becoming aware that AMA Pro had signed a letter of intent with JamSports. There is evidence that one of AMA Pro's board members, Ray Blank, advised Clear Channel that certain board members favored Clear Channel over JamSports and urged Clear Channel to communicate with the board and make its proposal known. Clear Channel did so: it advised the board's members in writing in early November 2001 of its willingness to make an improved offer, and it sent two separate written offers to at least one board member. The board as a whole was advised on or about November 30, 2001 (and perhaps earlier) that Clear Channel had made a proposal, though it is unclear whether the entire board was advised of the proposal's terms. On that same date, one board member, Richard Gray, reminded the others that AMA Pro was obligated to share Clear Channel's proposal with JamSports. It is undisputed, however, that JamSports was not advised of Clear Channel's proposal.

Based on these undisputed facts, JamSports has established as a matter of law that AMA Pro breached its obligation under paragraph 13 of the letter of intent to advise JamSports of its receipt of the Clear Channel proposal. It remains to be seen, however, whether this breach entitles JamSports to recover any damages. AMA Pro contends that the Clear Channel proposal went nowhere, and as evidence it points to, among other things, the fact that even after receiving Clear Channel's proposal, AMA Pro's Board voted to recommend making a deal with JamSports. For its part, JamSports says that AMA Pro's breach of its obligation to disclose the Clear Channel offer, and the continued discussions that certain AMA Pro board members had with Clear Channel representatives, permitted Clear Channel to keep its foot in the door,

36

prevented JamSports from countering Clear Channel's efforts vis-a-vis AMA Pro, and ultimately enabled Clear Channel to carry the day. These contentions involve genuinely disputed factual issues. Thus although the Court finds, pursuant to Federal Rule of Civil Procedure 56(d), that JamSports has established a breach of the exclusivity provision, final resolution of the claim will have to await trial.

JamSports also seeks summary judgment as to liability on its claim that AMA Pro breached its contractual obligation to negotiate in good faith toward the execution of a final promotion agreement. The letter of intent was a binding agreement to negotiate in good faith. *See, e.g., A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.*, 873 F.2d 155, 158 (7th Cir. 1989). This obligation barred both sides from "'renouncing the deal, abandoning the negotiations, or insisting on conditions that [did] not conform to the preliminary agreement.'" *Id.* (quoting *Teachers Ins. and Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). "For instance, a party might breach its obligation to bargain in good faith by unreasonably insisting on a condition outside the scope of the parties' preliminary agreement, especially where such insistence is a thinly disguised pretext for scotching the deal because of an unfavorable change in market conditions." *Id.*

JamSports' claim, as argued in its motion for summary judgment, is that AMA Pro's breach of good faith consisted of its insistence that it obtain approval of the final deal from the board of trustees of AMA Pro's parent entity, the AMA. JamSports says that this condition was outside the scope of the letter of intent and essentially served as a smokescreen for AMA Pro's change of heart about making a deal with JamSports. AMA Pro argues that the issue of bad faith is genuinely disputed; among other things, it points to evidence that it advised JamSports around

the time the letter of intent was signed, and afterward, that AMA's approval would be required.

"The full extent of a party's duty to negotiate in good faith can only be determined . . . from the terms of the letter of intent itself." *A/S Apothekernes,* 873 F.2d at 158. In this case, the letter of intent included a provision that unambiguously stated that any prior representations and understandings were superseded:

> 18. <u>Entire Agreement</u>. This letter includes provisions which shall be included in any agreement between the parties and supercedes [sic] all prior oral or written agreements, understanding, representations and warranties, and courses of conduct and dealings between the parties on the subject matter hereof. Except as otherwise provided herein, this letter may be amended or modified only by a writing executed by each of the parties hereto.

2d Am. Compl., Ex. A, ¶ 18. Based on this provision, AMA Pro's insistence on material contractual terms or conditions beyond those stated in the letter of intent could constitute a breach of its contractual duty to negotiate in good faith.

Determination of the precise contours of the duty to negotiate in good faith is complicated by the fact that there is precious little Illinois law on the subject. As Judge Posner noted for the court in *Venture Associates Corp. v. Zenith Data Systems Corp.,* 96 F.3d 275, 278 (7th Cir. 1996), most of the decisions purporting to describe Illinois law in this area have been issued by federal courts. But at least one Illinois court appears to have adopted *A/S Apothekernes'* formulation of the applicable standard, *see Milex Products, Inc. v. Alra Laboratories, Inc.,* 237 Ill. App. 3d 177, 189, 603 N.E.2d 1226, 1234 (1992), so for the time being we are comfortable following the federal formulation of the presumed Illinois standard.

Based on our reading of the decisional law on the topic, the fact that AMA Pro insisted upon a significant condition that was not included in the letter of intent is not by itself sufficient

to demonstrate AMA Pro's lack of good faith. The concept of good faith appears also to require an inquiry into the breaching party's intent. As one Illinois court noted in a different context, a "practical, commonsense construction" of good faith is the absence of bad faith or bad intent. *See Dotson v. Former Shareholders of Abraham Lincoln Land & Cattle Co.,* 332 Ill. App. 3d 846, 855-56, 773 N.E.2d 792, 801 (2002); *cf.* 810 ILCS 5/1-201(19) (Uniform Commercial Code definition of good faith: "honesty in fact in the conduct or transaction concerned"). In *Venture Associates,* the court likewise equated the lack of good faith with bad faith and stated that "[b]ad faith is deliberate misconduct." *Venture Assocs.,* 96 F.3d at 279.

The evidence submitted by JamSports in support of its motion for summary judgment is insufficient to show AMA Pro's bad intent as a matter of law; the issue is genuinely disputed. JamSports argues that based on the parol evidence rule and the terms of the letter of intent, AMA Pro should be precluded from relying on evidence of the purported understandings and discussions regarding the AMA's approval that are said to have occurred around and after the time the letter of intent was executed. This argument is well taken to the extent that AMA Pro is contending that approval by AMA was an express or implied part of the parties' contract. *See* 2d Am. Compl., Ex. A, ¶ 18; *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.,* 162 Ill. 2d 265, 269, 642 N.E.2d 1215, 1217 (1994) (parol evidence rule "generally precludes evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms"). But the Court is less certain that this evidence is inadmissible on the issue of AMA Pro's intent. Because JamSports raised the parol evidence rule in its reply brief (in reply to AMA Pro's reliance on the alleged discussions and understandings), AMA Pro has not yet addressed the point. We can, however, safely defer final determination of the

admissibility issue for a motion *in limine,* for in seeking summary judgment, JamSports has

relied on nothing other than AMA Pro's insistence on AMA's approval, which as we have noted

is an aspect of proof of bad faith but insufficient by itself to prove the point. Because good faith

is a question of fact, *see Venture Assocs.,* 96 F.3d at 280, and one that is genuinely disputed at

this point, it can be resolved only at trial. JamSports' motion for summary judgment is therefore

denied as to the claim of breach of the contractual obligation of good faith.

With regard to Count 1, AMA Pro seeks to bar JamSports' claim of lost profits, arguing

that the so-called "new business rule" precludes JamSports, as a prospective new entrant into the

supercross promotion business, from recovering the profits it claims it would have made. As the

Court noted in ruling on the defendants' motions to dismiss, lost profits may, in appropriate

circumstances, be recovered based on a party's breach of a contractual obligation to negotiate in

good faith. *See Venture Assocs.,* 96 F.3d at 278-79. Under Illinois law, as a general rule, a new

business cannot recover lost profits. *See, e.g., Stuart Park Assocs. Ltd. Partnership v. Ameritech

Pension Trust,* 51 F.3d 1319, 1328 (7th Cir. 1995). This rule appears to be a specific application

of the general rule that speculative damages are not recoverable. *See, e.g., Hill v. Brown,* 166 Ill.

App. 3d 867, 875, 520 N.E.2d 1038, 1043 (1988) (cited in *Stuart Park*). There are, however,

exceptions to the rule. *See, e.g., Malatesta v. Leichter,* 186 Ill. App. 3d 602, 621, 542 N.E.2d

768, 782 (1989). The Court agrees with JamSports that because discovery on damages was

deferred, a ruling that its not-yet-declared damages theory is legally inadequate would be

premature.[10]

---

[10] Any attempt by the defendants to renew this issue following discovery on damages will
have to come by way of a motion *in limine* to preclude evidence regarding lost profits, as the
deadline for filing summary judgment motions has passed.

2.     *Breach of contract (Count 2) and promissory estoppel (Count 17)*

In Count 2, JamSports says that it reached a final promotion agreement with AMA Pro

but that AMA Pro refused to perform and instead granted the promotion rights for its supercross

series to Clear Channel. Count 17 is an alternative claim of promissory estoppel in which

JamSports alleges that it incurred significant expenses in reliance on AMA Pro's allegedly

unambiguous promise to confer on JamSports the right to promote the series.[11]

AMA Pro seeks summary judgment on both of these claims on the ground that the parties

reached no final promotion agreement. Because the agreement contemplated by the parties was

to cover a seven year period, *see* 2d Am. Compl., Ex. A, ¶ 1, under Illinois' statute of frauds "the

promise or agreement upon which [JamSports'] action shall be brought, or some memorandum

or note thereof, [must] be in writing, and signed by the party to be charged therewith, or some

other person thereunto by him lawfully authorized." 740 ILCS 80/1. The statute of frauds

likewise applies to JamSports' promissory estoppel claim. *See Fischer v. First Chicago Capital*

*Markets, Inc.,* 195 F.3d 279, 284 (7th Cir. 1999); *McInerney v. Charter Golf, Inc.,* 176 Ill. 2d

482, 492, 680 N.E.2d 1347, 1352 (1997).

It is undisputed that AMA Pro did not execute a promotion agreement as such. In

opposing summary judgment, JamSports relies on the rule that to satisfy the statute of frauds, the

writing need not be a single document but rather may consist of several documents as long as

they collectively contain a sufficient description of the agreement's subject matter and terms, one

---

[11] It is unclear whether success on a promissory estoppel theory would limit JamSports to
recovery of the expenses it incurred in reliance on the alleged promise or whether JamSports
would be able to seek lost profits. *See, e.g., Gerson Electric Constr. Co. v. Honeywell, Inc.,* 117
Ill. App. 3d 309, 312, 453 N.E.2d 726, 728 (1983); *see also Goldstick v. ICM Realty,* 788 F.2d
456, 463-64 (7th Cir. 1986).

of the documents is signed by the party to be charged, and that document refers to the other writings or they are connected sufficiently to show that they relate to the same contract. *See, e.g., Prodromos v. Howard Savings Bank,* 295 Ill. App. 3d 470, 474-75, 692 N.E.2d 707, 710 (1998). In arguing that this requirement has been met, JamSports relies on the red-lined version of the promotion agreement that its attorney sent after (JamSports claims) the parties had reached final agreement on all its terms; minutes from a meeting of AMA Pro's board of directors at which it is claimed to have approved that version of the agreement; and deposition testimony by an AMA Pro representative regarding the board's actions. Because the minutes in question were approved by the board and were signed by the corporate secretary, they are the types of documents that may suffice to constitute the signed writing required by the statute of frauds. *See Chapman v. Freeport Securities Co.,* 174 Ill. App. 3d 847, 854, 529 N.E.2d 6, 11 (1988). The deposition testimony in question was also signed and thus likewise may qualify as a signed writing. *See Bower v. Jones,* 978 F.2d 1004, 1009 (7th Cir. 1992).

AMA Pro points out that neither the minutes nor the deposition testimony state that the agreement with JamSports was approved. Rather they reflect that AMA Pro's board recommended that the agreement be approved by AMA. JamSports, as noted earlier, contends that this action by AMA Pro constituted a breach of its obligations under the letter of intent, but for purposes of the statute of frauds, signed evidence that the board *recommended* the agreement to its parent entity does not satisfy the requirement of a signed writing evidencing that an agreement was reached.

JamSports argues, however, that AMA Pro is equitably estopped from asserting a statute of frauds defense. AMA Pro contends that this argument is barred because JamSports' equitable

42

estoppel "claim" is not alleged in its complaint, but that contention stems from a misunderstanding of the role of equitable estoppel vis-a-vis the statute of frauds. In this context, equitable estoppel is not a separate claim; rather, it is a doctrine that may bar AMA Pro's assertion of a statute of frauds defense. Because the Federal Rules of Civil Procedure do not require a plaintiff to reply to a defendant's affirmative defense, *see* Fed. R. Civ. P. 7(a), Jamsports was not required to assert equitable estoppel in a pleading. Because this is AMA Pro's only response to the assertion of equitable estoppel, AMA Pro is not entitled to summary judgment based on its statute of frauds defense.

3.      *Tortious interference claims (Counts 3, 4, and 18)*

JamSports has asserted three state law tort claims against Clear Channel: Count 3, a claim that Clear Channel tortiously interfered with the letter of intent between JamSports and AMA Pro; Count 4, a claim that Clear Channel tortiously interfered with the alleged final promotion agreement; and Count 18, an alternative claim for interference with prospective advantage. Clear Channel has moved for summary judgment on these claims.

Two of Clear Channel's arguments parallel those the Court has already addressed with regard to AMA Pro's and JamSports' summary judgment motions. Clear Channel argues that Count 3 cannot be sustained based on a theory that the letter of intent was itself an agreement for promotion of AMA Pro's supercross series; the Court agrees for the reasons previously discussed. Clear Channel argues that Count 4 is deficient because the statute of frauds bars JamSports from claiming there was a final promotion agreement; for the reasons previously discussed, summary judgment is denied on this claim.

Returning to Count 3, Clear Channel argues that JamSports has no evidence that Clear

Channel knew about the exclusivity requirement contained in the letter of intent, an element of a claim of tortious interference with a contract. *See generally HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill. 2d 145, 154-55, 545 N.E.2d 672, 676 (1989) (identifying elements of tortious interference claim). The Court disagrees. JamSports cites evidence from which a jury could find that one of AMA Pro's board members told at least one executive of Clear Channel about the particulars of the exclusivity requirement.

Clear Channel also argues that the proposal that it sent to AMA Pro during the exclusivity period stated that it was being made contingent on AMA Pro's right to consider it, and thus there could not have been an intentional inducement of a breach of the exclusivity clause. A jury reasonably could find that this statement, made at the end of the letter containing the offer – which was tendered only after Clear Channel was made aware of AMA Pro's agreement to deal only with JamSports – contained boilerplate language that was put in merely to cover Clear Channel's tracks rather than as a serious *caveat*. And we note that if the acquiescence of the contracting party were sufficient to defeat a tortious interference claim, for all practical purposes the tort would no longer exist – as a breach by the contracting party is *required* to prove such a claim. *See HPI Health Care Services,* 131 Ill. 2d at 154-55, 545 N.E.2d at 676.

Finally, Clear Channel argues that JamSports cannot prove damages arising from AMA Pro's rejection of a deal with JamSports because AMA Pro did not reject the deal, and, in any event, AMA Pro walked away for reasons unrelated to Clear Channel's making of a proposal. The latter point is genuinely disputed, making summary judgment inappropriate. The former argument makes no sense: JamSports' claim is that Clear Channel's alleged interference caused AMA Pro to impose AMA approval as a condition of a deal, knowing full well that the AMA

44

motion for summary judgment against AMA Pro/Paradama [docket # 119], AMA Pro/Paradama's motion for summary judgment [docket # 123], and Clear Channel's motion for summary judgment [docket # 135]. JamSports' motion to strike venue affidavits [docket # 149] and Clear Channel's motion to exclude the Baade's testimony [docket # 110] are denied. Trial on the remaining claims (Counts 1, 2, 3, 4, 15, 17 and 18) remains set for November 15, 2004. The final pretrial order is to be filed by October 15, 2004, and the final pretrial conference is set for November 4, 2004 at 2:00 p.m. The case is set for a status hearing on September 8, 2004 at 9:30 a.m. for the purpose of discussing the format of the final pretrial order and setting an overall page limit for motions *in limine* and opposing memoranda.

MATTHEW F. KENNELLY
United States District Judge

Date: August 19, 2004

would not approve. Thus the fact that AMA Pro "recommended" the deal to AMA does not defeat JamSports' claim.

Finally, Clear Channel seeks summary judgment on JamSports' claim of tortious interference with prospective advantage, based on the so-called "competition privilege." Under this rule, "'[t]he privilege to engage in business and to compete allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will.'" *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003) (quoting *Soderlund Bros., Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 615, 663 N.E.2d 1, 8 (1995)). But a defendant is entitled to the protection of this privilege only if it "has not employed a wrongful means or is not motivated solely by malice or ill will." *Id. Soderlund Bros.* cites with approval section 768 of the Restatement (Second) of Torts, which states that the privilege does not apply if the defendant "employ[s] wrongful means" or its action "create[s] or continue[s] ... an unlawful restraint of trade." Restatement (Second) of Torts § 768, at 39 (1979), *quoted in Soderlund Bros.*, 278 Ill. App. 3d at 616, 663 N.E.2d at 8. Because the Court has ruled that JamSports' claim of monopolization must go to trial, and because there is evidence from which a jury could find that Clear Channel employed "wrongful means" – specifically the type of conduct relied upon to support the monopolization claim – summary judgment based on the competition privilege is inappropriate.

## Conclusion

For the reasons stated above, the Court denies JamSports' motion for partial summary judgment on its antitrust claims [docket # 118]; and grants in part and denies in part JamSports'